# EXHIBIT B

## IN THE SUPERIOR COURT OF FULTON COUNTY

### STATE OF GEORGIA

RIAN LANE BARRETT and DIANA BARRETT

CIVIL ACTION
NUMBER 2001 CV 33885

_____

_____

PLAINTIFF

VS

. Nokia Corporation, 1290 Avenue of the Americas, New York, NY 10104
. Nokia, Inc., c/o National Registered Agents, Inc., 3761 Ventura Dr., Duluth, GA 30096
. Nokia Mobile Phones, Inc., 6000 Connection Dr., Irving, TX 75039
. Nokia Holding, Inc., c/o National Registered Agents, Inc., 3761 Ventura Dr., Duluth, GA 30096
. Bellsouth Mobility, Inc., c/o Joaquin R. Carbonell, registered agent, 1100 Peachtree St., #1000
    Atlanta, GA 30309

_____

DEFENDANT
. Cellular Telecommunications Industry Association, 1250 Connecticut Ave., N.W., Washington, D.C.

### SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

| | |
|---|---|
| Michael Weinstock, Esq. | Ga. Bar No. 746454 |
| Richard Capriola, Esq. | Ga. Bar No. 108880 |
| Jan P. Cohen, Esq. | Ga. Bar No. 174337 |
| Daniel P. Sinaiko | Ga. Bar No. 648848 |

WEINSTOCK & SCAVO, P.C.
3405 Piedmont Rd., N.E., Suite 300
Atlanta, GA 30305
(404) 231-3999

an answer to the complaint which is herewith served upon you, within 30 days after the service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _____ day of _____ Jan _____ XXXX 2001.

Juanita Hicks
Clerk of Superior Court

By _____
Deputy Clerk

To Defendant upon whom this petition is served:

This copy of complaint and Summons was served upon you _____ 19____.

_____ Deputy Sheriff

INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

FEB 13 2001 19:14                                          202 785 8203        6009-082-685
                                                                              PAGE.02

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

BRIAN LANE BARRETT and
DIANA BARRETT,

        Plaintiffs,

v.

NOKIA CORPORATION, a Delaware
corporation, NOKIA, INC., a Delaware
corporation, NOKIA MOBILE PHONES, INC,
a Delaware Corporation, NOKIA HOLDING
INC., a Georgia Corporation, BELLSOUTH
MOBILITY, INC., a Georgia corporation
and CELLULAR TELECOMMUNICATIONS
INDUSTRY ASSOCIATION, a District of
Columbia corporation,

        Defendants.

CASE NO. 2001-CV-33385



## COMPLAINT

NOW COME Plaintiffs, Brian Lane Barrett and Diana Barrett, by and through their undersigned counsel of record, Weinstock & Scavo, P.C., and for their Complaint against Defendants, Nokia Corporation, Nokia, Inc., Nokia Mobile Phones, Inc., Nokia Holding Inc., Bellsouth Mobility, Inc. and Cellular Telecommunications Industry Association, show this honorable Court as follows:

## THE PARTIES

1.

Plaintiffs, Brian Barrett and Diana Barrett, are citizens of the State of Georgia who reside in Fulton County.

2.

Defendant, Nokia Corporation (hereinafter, in conjunction with all other Nokia entities referred to as "Nokia"), is a Delaware corporation with its principal place of business in the State of New York. Said Defendant is subject to the jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91 by virtue of having transacted business within this State, by having committed a tortious act within this State, by having committed a tortious injury in this State caused by acts or omissions outside this State and by having regularly done or solicited business which has resulted in substantial revenue from goods used or consumed and services rendered in this State. Said Defendant may be served at the following address: 1290 Avenue of the Americas, New York, New York 10104.

3.

Defendant, Nokia, Inc. (hereinafter, in conjunction with all other Nokia entities referred to as "Nokia"), is a Delaware corporation with its principle place of business in Irving, Texas. Said Defendant is subject to the jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91 by virtue of having transacted business within this State, by having committed a tortious act within this State, by having committed a tortious injury in this state caused by acts or omissions outside this State and by having regularly done business or solicited business which has resulted in substantial revenue from goods used or consumed and services rendered in this State. Said Defendant's registered agent is National Registered Agents, Inc., 3761 Ventura Drive, Duluth, Gwinnett County, Georgia 30096.

4.

Defendant, Nokia Mobile Phones, Inc. (hereinafter, in conjunction with all other Nokia entities referred to as "Nokia"), is a Delaware corporation with its principle place of business in

2

Irving, Texas. Said Defendant is subject to the jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91 by virtue of having transacted business within this State, by having committed a tortious act within this State, by having committed a tortious injury in this state caused by acts or omissions outside this State and by having regularly done business or solicited business which has resulted in substantial revenue from goods used or consumed and services rendered in this State. Said Defendant may be served at the following address: 6000 Connection Drive, Irving, Texas 75039.

5.

Defendant, Nokia Holding Inc. (hereinafter, in conjunction with all other Nokia entities referred to as "Nokia"), is a corporation organized and existing pursuant to the laws of the State of Georgia. Said Defendant's registered agent is National Registered Agents, inc., 3761 Ventura Drive, Duluth, Gwinnett County, Georgia 30096. Defendant may be served at this address and is subject to the jurisdiction and venue of this Court.

6.

Defendant, Bellsouth Mobility, Inc. (hereinafter referred to as "Bellsouth Mobility"), is a corporation organized and existing pursuant to the laws of the State of Georgia. Said Defendant's registered agent is Joaquin R. Carbonell, 1100 Peachtree Street, Suite 1000, Atlanta, Fulton County, Georgia 30309. Defendant may be served at this address and is subject to the jurisdiction and venue of this Court.

7.

Defendant, Cellular Telecommunications Industry Association (hereinafter referred to as "CTIA"), is a trade association incorporated under the laws of the District of Columbia, having

3

its principal place of business at 1250 Connecticut Ave., N.W., Washington, D.C.. This Defendant is subject to the jurisdiction and venue of this Court.

8.

Defendant, Nokia, at all times relevant to the actions complained of herein, through its agents, distributors, servants and employees, was engaged in the business of manufacturing and distributing wireless handheld mobile telephones ("WHHPs").

9.

Defendant, Bellsouth Mobility, at all times material hereto, was engaged in the sale and/or promotion of WHHP equipment and transmission services.

10.

At all times relevant hereto, Defendant, CTIA, acting through its agents, representatives, servants and/or employees, represented that the use of WHHPs was safe.

## FACTUAL BACKGROUND

11.

Plaintiff, Brian Barrett, is thirty-eight (38) years old, having a date of birth of August 1, 1962. He now suffers from multiple symptoms as a result of the brain tumor caused and promoted by Defendants' products and services.

12.

In and around 1994, Plaintiff, Brian Barrett, believing that wireless handheld telephone ("WHHP") technology and Nokia products were safe, began personal use of Nokia WHHPs.

13.

Since that time, Plaintiff has continued to use Nokia WHHPs and, at all times relevant, has only owned WHHPs manufactured and sold by Nokia.

4

14.

At all times relevant hereto, Plaintiff, Brian Barrett, used telecommunication transmission services provided by Defendant, Bellsouth Mobility.

15.

In or around January and February, 2000, Plaintiff, Brian Barrett, was diagnosed with a brain tumor known as anaplastic astrocytoma.  Said brain tumor was directly caused and promoted by Brian Barrett's exposure to RFR emitted from Defendants' products and in connection with Defendants' services, as will be set forth more fully herein.

## WHHP TECHNOLOGY

16.

Service for WHHPs is provided by a Cell Phone Carrier who obtains a license from the Federal Communication Commission (FCC).  Each carrier is provided a specific frequency over which its signal is broadcast and over which the transmission of those calls for each of its customers is made.

17.

Based upon the license granted by the FCC and the frequency specifications provided to sellers/manufacturers of WHHPs, the Cell Phone Carrier creates a network by which the wireless signal is transferred to land lines and the call is sent to a receiver or sent to the cell phone customer.

18.

Cell Phone Carriers base the specifications of the battery and circuitry for all WHHPs in their network license and frequency information granted by the FCC.

5

19.

The specifications of each Cell Phone Carrier are given to the WHHP manufacturers. Each manufacturer constructs the WHHP to fit the different specifications of the Cell Phone Carriers.

20.

The specifications allow each Cell Phone Carrier to identify each cellular phone customer by a computer code in the WHHP and determine the customer's cell location and customer status.

21.

Once the customer's cell location is determined, a wireless signal is transmitted from the WHHP antenna to the nearest cell tower or from the nearest cell tower to the WHHP antenna depending upon whether the customer is making a call or receiving a call.

22.

WHHPs emit RFR at the Cell Phone Carrier's specific wave frequency to transmit voice messages via an antenna located on the WHHP. WHHPs operate at between 800 and 1900 megahertz (MHz) and either emit analog or digital signals.

23.

Each time a customer makes a wireless telephone call, receives a wireless telephone call, and at all times during a call from and received by a WHHP, the customer is exposed to harmful Radio Frequency Radiation ("RFR") emitted from the WHHP antenna which is in close proximity to the user's head.

6

24.

At all times relevant, Defendants, themselves, or by use of others, did manufacture, create, design, test, label, package, distribute, supply, market, sell, advertise, and/or otherwise distribute products and services related to WHHPs in Atlanta, the State of Georgia, and elsewhere in the United States, as well as to WHHP owners and users through its service areas, and as to some Defendants, nationally and internationally.

25.

The Defendants did business in Atlanta and the State of Georgia, performed services in Atlanta and the State of Georgia, made contracts to be performed, in whole or in part, in Atlanta and the State of Georgia, and/or manufactured, tested, sold, offered for sale, supplied or placed in the stream of commerce, or, in the course of business, materially participated with others in so doing, the sale of WHHPs and cellular service.

26.

Defendants knew or should have known these WHHPs to be defective, unreasonably dangerous and hazardous, foreseeably causing injury to the Plaintiffs as described herein, and committed and continue to commit tortious and other unlawful acts in Atlanta and the State of Georgia

## SCIENTIFIC KNOWLEDGE OF THE DEFENDANTS

27.

The Defendants knew or should have known that the use of RFR frequency in WHHPs was defective, unreasonably dangerous, hazardous and also that it was foreseeable that WHHPs would cause injury.

7

28.

The medical and scientific communities were well aware of the biological effects of RFR in the 1920s. In 1928, Helen Hosner, a researcher at the Albany Medical College, showed that radio waves were capable of heating body tissue in a study investigating the effects of experimental short wave radio transmitters to workers at a General Electric research facility. Her work was entitled "Heating Effects Observed in a High Frequency Static Field," public in *Science*.

29.

During World War II, intensive research and engineering work led to the development of devices capable of producing electromagnetic energy at the radio frequency band.

30.

In a 1948 article published in the archives of *Physical Medicine*, it was reported that electromagnetic radiation at 2,450 MHz was "highly productive in producing lenticular opacities."

31.

The medical and scientific communities were well aware of the extensive research published and reported throughout the 1950s and 1960s of the dangers of causing burns when RFR is applied over a bony prominence. It was revealed that non-uniformities such as bone ridges and irregular fat layers caused the energy to be absorbed non-uniformly within the body or head.

32.

In 1952, researchers noted that "experiments in which the head area alone was directly irradiated suggests that the fatal outcome was the result of an excessive rise in brain temperature.

8

The lethal effects of irradiation to a limited area of the body are different from those in which the entire animal is exposed." The warning was published after researchers had exposed laboratory rats to a few seconds of intense exposure of radio frequency radiation. The warning was published in *Microwave Radiation: Biophysical Considerations and Standards Criteria, IEEE Transactions on Biomedical Engineering.*

33.

In 1955, researchers Schwam and Piersol published their work that radio frequency energy, in a broad range from 500 MHz to 1000 MHz, is preferentially deposited beyond the skull and absorbed into the brain.

34.

The Defendants have known since the 1970s that this type of radiation is absorbed by the human body and not reflected away. Overwhelming research by notable scientists has indicated that more than 50% of the radiated energy from cell phones is absorbed with the head and brain.

35.

It was well known in the scientific and medical communities in the 1970s that an antenna is the most efficient means of depositing energy into the human body and penetrating human tissue.

36.

In 1971, A. W. Guy published in *IEEE Transaction in Microwave Theory and Techniques* that in order to obtain selective heating, "hot spot" heating, it is necessary to expose the tissue to the near zone fields of the energy source, namely the antenna. From this experimental data at 433 MHz, 750 MHz, and 918 MHz, the research confirmed that energy is

9

readily absorbed form the induction fields in the near zone.  The absorption within the brain was found to be about 20 times greater than that of the skull and subcutaneous fat.

37.

In 1972, in a study by I. J. Bahl, it was demonstrated that frequencies between 700 MHz and 1000 MHz interact most efficiently with human tissue to yield the greatest energy absorption and that the temporal lobe of the brain is the most sensitive area of the body to this type of radiation.  The work performed by Bahl was published in *IEEE Transactions on Microwave Theory and Techniques*, a publication accepted as authoritative in the medical and scientific communities.

38.

In 1977, J. C. Lin published the results of his research in *IEEE Transaction on Microwave Theory and Techniques*.  Results revealed that because microwave absorption occurs in a very short time, there is very little chance for heat conduction to take place; the conduction of heat takes much longer.  At "hot spots" the inability of biological tissue to get rid of excess heat quickly and efficiently may be yet another mechanism leading to destructive exposure.

39.

Research confirmed that "hot spot" absorption is dependent on the diameter of the head model which was used.  As the diameter decreased, the absorption effect became more pronounced. Most notably, the greatest absorption enhancement occurs at frequencies between 800 MHz to 1000 MHz, effectively covering the portable cellular telephone transmit band.

40.

In 1977, O. P. Gandhi published a study in *Radio Science* which confirmed that radiation absorption enhancement occurs when subjects are close to reflecting surfaces.  Gandhi reported a

10

measured energy absorption enhancement factor of as much as 27 in close proximity to corner shaped reflectors and about 4.7 for flat reflectors.

41.

In 1978, a WHHP manufacturer studied the efficiency of the antenna and learned that the maximum Specific Absorption Rate exists at the antenna "feed point."

42.

Long before the introduction of cellular telephones, researchers provided data indicating that children absorb approximately 50% more radiation within their heads than do adults. The research performed by C. H. Durney reported in *IEEE Transactions on Microwave Theory and Techniques* in 1979, only took into consideration the plain wave, far field exposures and did not include any of the enhancement effects that are introduced by the near zone operation of cellular telephones.

43.

In 1979, researchers Sheppard, Bawin and Adey confirmed in a published article that low intensity modulated (16Hz) 450 MHz fields produced modified calcium efflux through brain cell membranes. The researchers observed the effect for power density levels lower than 2.0 mW/cm². The work was published in *Radio Science* in December 1979.

44.

In 1979, in an experiment by J. L. Meyerhoff, laboratory rats were killed quickly to prevent unwanted changes in brain structure. It was reported that "it is preferable to focus the microwave energy into the head of the animal, thereby increasing the efficiency of the energy delivered to the brain." The experiment was published in *IEEE Transactions on Microwave Theory and Techniques* in January 1980.

11

02/13/01  19:11  CTI  404

45.

The cellular phone industry conducted extensive research in the early 1980s on the effects of antennas and discovered that there is a large amount of stored energy that is disposed immediately around the antenna of a cell phone.

46.

In follow up research, Adey published in 1980 research demonstrating modifications in brain cells at low level radiation exposure.  Adey also reported that weak modulated frequency radiation results in major physiological changes.  The work was published in *Proceedings of the IEEE*, January 1980.

47.

In 1981, a researcher for a major WHHP manufacturer was quoted in *IEEE Transactions on Vehicular Technology* (November) "the proposed standard recognizes the possibility of encountering fields higher than the maxima of the protection guides in the close vicinity of low power radiation, like portable communication equipment.  For this reason, an exclusion clause for devices operating at 1GHz or less end with less than 7 watts output power has been proposed."

48.

At the same time, researchers from the same company publicly stated, "the Radio Frequency Protection Guides of the American National Standards Institute at 750 MHz would be violated at 0.3 centimeters distance by a resident dipole radiating about 1mW and at .5 centimeters distance by a radiated power of 4mW." "A resident dipole provides the most favorable condition of minimum stored energy around the antenna." The researchers conceded

12

that, "a rigorous enforcement without exclusion of the radio frequency protection guides would render portable radios practically useless."

### 49.

Researchers from a CTIA member manufacturer concealed from the public the enhancement effects of antennas and the efficiency that antennas deposit energy into brain tissue. In an article published in 1981 in *IEEE Transactions on Vehicular Technology*, a prominent WHHP manufacturer employee stated, "this paper addresses the question of how long the power radiated by a dipole has to be so that the field near the antenna never exceeds the ANSI-Proposed Protection Guides for distances greater than .3 centimeters, which is the spacing which at times separates the antenna form the head of the portable radio user. Radiated power of a few milliwatts is enough to exceed the proposed radiation protection guides at 705 MHz. Such reticence in accepting the clause probably resides in the fact that the near field of antennas is largely uninvestigated." At the same time, a prominent researcher from the same company stated, "the study of the near field has been substantially neglected." The same prominent researcher stated, "dipole antennas, although extensively used in portable and mobile communications, have not been carefully investigated in the near field."

### 50.

In 1981, during the time that the exclusion of portable cellular phones was debated with the ANSI Committee, a researcher from a CTIA member company was quoted as stating, "strict enforcement . . . technically forbids the exposure to a resident dipole about 19 centimeters long, radiating 1mW."

51.

In 1982, a CTIA member company's researcher found that as little as 250 microWatts radiated power would be enough to exceed the safety standards established by the American National Standards Institute when using the helix antenna as the radiator for near zone exposure. The study was published in *IEEE Transactions on Vehicular Technology* in November, 1982.

52.

These researchers found that the exposure to the helical antennas yields a power density of as much as 127 mW/cm$^2$ when the antenna is placed about 1 centimeter distant. The radiated power was on .02 Watts, which is thirty times less than what is radiated from a portable cellular phone.

53.

Since at least 1984, Defendants conducted research into the health effects of RFR, and based on that information, they knew or should have known that the WHHPs produced high levels of RFR.

54.

In 1984, in an article published by *Microwave News*, there was a report of a 1984 study by the United States Air Force in which it was found by Dr. Vemot of the University of California "findings of excess malignancies in the exposed animals is provocative" after being exposed to radio frequency radiation.

55.

In 1988, the United States Air Force sponsored a study performed by A. W. Guy in which 100 rats were irradiated over a three-year period and compared to 100 rats that were not exposed to radiation but were otherwise treated identically. After the experiments were completed, the

14

researchers reported that 18 malignant tumors developed in the exposed rats as compared to 5 in the control group rats. The researchers claimed that such a difference was "statistically highly significant." They also stated, "at face value this last finding suggests that low levels of microwave radiation can cause cancer in mice." Remarkably, the Environmental Protection Agency accepted a report by the same researchers who suddenly "corrected" their conclusions. The EPA, in 1986, stated that evidence of carcinogenicity must be confirmed to a specific tumor type.

56.

In 1989, Stephen Cleary presented a review of the state of research related to non-thermal interactions and effects of radio frequency radiation. He concluded, "cellular studies provide convincing evidence that RF radiation, and other types of electric or magnetic fields, can alter living systems via direct non-thermal mechanisms, as well as via heating."

57.

The American National Standards Institute ("ANSI") has adopted a set of electromagnetic energy exposure levels that the Institute of Electrical and Electronic Engineers (IEEE) has determined to be safe for humans. The ANSI safety standard was initially developed during the 1960s, modified during the early 1980s, and modified again, most recently, during the early 1990s.

58.

In its initial form, during the 1960s the IEEE/ANSI safety standard, known as ANSIC95.1, established a maximum safe exposure level for radio frequency radiation at $10.0 \text{mW/cm}^2$. The modified standard ANSIC95.1-1982 set the maximum level for radio frequency exposure on a sliding scale by dividing the frequency by a multiple of three hundred.

15

At 845 MHz, the safety standing would be 2.8mW/cm$^2$; at 1900 MHz, the safety standing would be 6.33 mW/cm$^2$.

59.

During a 1989 meeting of the ANSI Committee held in Tucson, Arizona, industry representatives dominated the membership of the standard setting committee. After a heated discussion and debate over the exclusion clause, it was decided upon a vote by the committee that portable cellular telephones would not be excluded from regulations or compliance under the ANSI Safety Standard. A short time after the meeting, at another quietly held committee meeting attended by a select, smaller group of members, the exclusion clause passed, and as a result, cell phones would be excluded from any testing, compliance, or monitoring by any safety standard, government agency, or regulatory body.

60.

The cellular phone industry manipulated the research and pressured members of the Safety Standard Committee to exempt portable cellular telephones from regulation and compliance under the ANSI standards. Cellular telephones, then and now, would not meet the standard established in 1982.

61.

In 1992, a project performed by A. Maes confirmed a marked increase in the frequency chromosomal aberrations and the presence of micro nuclei in peripheral blood after exposed to 2,450 MHz radiation.

62.

In 1992, F. Montecchi published an article in *IEEE Transactions on Biomedical Engineering* that some antennas are specifically designed to use the non-radiating induction

16

energy (around the antenna) for penetration into humans. One such antenna was specifically developed to provide an improved method for depositing energy into tissue for hypothermia treatment.

### 63.

In 1992, it was reported in *Microwave News*, a news publication widely circulated and read by the scientific and medical community, that Keith Angstadt, an antenna technician, was treated at Johns Hopkins University for exposure to radio frequency radiation which led to his loss of night vision and color blindness. The retinas of his eyes had sustained 5 mW/cm$^2$ of continuous wave radiation.

### 64.

On January 21, 1993, the first consumer lawsuit for injuries suffered as a result of exposure to cell phone RFR against the cell phone industry was filed.

### 65.

On January 26, 1993, a senior cell phone company executive announced to the news media, and subsequently reported by the news media to the public, that "thousands of studies" had already shown cellular phones were safe. Such statement was fraudulent, deceitful, and misleading.

### 66.

Defendants, under increasing public pressure, funded a twenty-seven million dollar surveillance and research effort in hopes of proving that WHHPs were safe and not a health threat. This research project failed to prove the safety of the WHHPs.

17

67.

Dr. George Carlo was employed by the cell phone industry to lead this research effort. Under his leadership, the Science Advisory Group (SAG) and Wireless Technology Research (WTR) entities were formed to coordinate the program. Both organizations were funded by the Cellular Telecommunications Industry Association, which is supported by the companies that produce WHHPs and its communications infrastructure.

68.

On July 16, 1993, the CTIA, representing many of the named Defendants, issued a report entitled "Safety Updated-Fast Facts: Portable Cell Phone Safety," in which is was fraudulently and deceptively stated, in bold print, the following: **"Rest assured. Cellular telephones are safe!"** The report further stated that cell phones fall within the safety standards of the Federal Communications Commission ("FCC"). However, the Defendants fraudulently and deceitfully omitted the fact that the FCC had also declared that it does not consider itself the "expert agency" for evaluating health effects.

69.

On July 19, 1993, Elizabeth Jacobson, Deputy Director for Science at the Center for Devices and Radiological Health, Food and Drug Administration, sent correspondence to CTIA president, Thomas Wheeler, which clearly identified certain fraudulent and deceitful statements made by the Defendants to the public regarding the "safety" of WHHPs. In pertinent part, this letters states:

> I am writing to let you know that we were concerned about two important aspects of your press conference on July 16 concerning the safety of cellular phones, and to ask that you carefully consider the following comments when you make future statements to the press.

18

First, both the written press statements and your verbal comments during the conference seemed to display an unwarranted confidence that these products will be found to be absolutely safe. In fact, the unremittingly upbeat tone of the press packet strongly implies that there can be no hazard, leading the reader to wonder why any further research would be needed at all. (Some readers might also wonder how impartial the research can be when its stated goal is "a determination to reassure consumers," and when the research sponsors predict in advance that "we expect the new research to reach the same conclusion that the cellular phones are safe." ...

We are even more concerned that your press statements did not accurately characterize the relationship between CTIA and the FDA ... [S]ince it is not yet clear whether we will help to direct the research program, it is premature to state that we will credential the research.

To sum up, Mr. Wheeler, our role as a public health agency is to protect health and safety, not to "reassure consumers." I think it is very important that the public understand where we stand in evaluating the possibility that cellular phones might pose a health risk ....

70.

In 1993, N. Kuster published an article in *IEEE Transactions on Biomedical Engineering* which demonstrated the very high level of energy absorbed into the head and brain in the area close to the location of the antenna. Kuster reported that the maximum SAR measured in models of human heads exposed to 1 Watt of energy was 5 m/W/g.. The antenna employed was approximately one inch from the head of the model.

71.

In December 1993, Chegrinets reported that pulsed 150 to 300 MHz at 5 mW/cm$^2$ caused chromosomal changes in human peripheral lymphocytes and whole blood cells.

19

02/13/01  19:14   CT

72.

In or about late 1993/early 1994, the cell phone industry, including the named Defendants, through CTIA, organized a committee which was to draft a manual to discuss "responsible" WHHP use. After receiving a draft of the manual, Thomas Wheeler, president of CTIA, sent out a memorandum expressing his concerns over certain language used in the manual which acknowledged and/or implied that the use of WHHPs could pose health risks. An example of such substantive changes follows, with the suggested deletions put forth in bold typeface:

Do not operate your transportable cellular telephone when holding the antenna, or when any person is within 4 inches (10 centimeters) of the antenna. Otherwise, **you may impair cell quality, may cause your phone to operate at a higher power level than is necessary, and may expose that person to RF energy in excess of the levels established by the updated ANSI Standard.**

**If you want to limit RF exposure even further, you may choose to control the duration of your calls or maintain distance from the antenna of more than 4 inches (10 centimeters).**

For best quality, keep the antenna free from obstructions and point it straight up."

73.

Gandhi, a well-known and respected researcher, published findings of his research that were contradictory to Kuster's. Gandhi reported that the maximum SARs within the human brain would be about 30 times lower than what Kuster had reported. But, by March of 1994, the word in the research community had spread that the Gandhi team had, in fact, misstated SAR figures. During the 1994 Bioelectromagnetics Society 16th Annual Conference, Gandhi produced findings of still higher maximum SARs for the same research. During his presentation, SARs corresponded, at times, to levels as much as ten times higher than were previously

20

02/13/01  19:14    CTI    404 815 2424

reported.  The conference results, presented in Copenhagen, Denmark, never reached the U.S.

audience.    In a letter to the Federal Communications Commission, August 1994, Gandhi

explained the nature of the errors and revised his experimental results upward.  That is, nearly a

full year after the initial false claims of safety – and almost six months after his revisions first

became known – the Gandhi team provided an official correction.

74.

The Defendants knew that early in 1994 research performed in India by Sarkar, *et al.*,

confirmed that DNA modifications result from low-level exposure to radio frequency radiation.

Clearly, if radio frequency radiation can rearrange the DNA in tissue, then it can initiate cancer.

75.

In 1994, Henry Kues, a Johns Hopkins researcher, reported cell destruction and cell death

comparable to that which would be expected from ultraviolet radiation was reported from

exposure to rhesus monkeys to 1,250, 2,450 and 2,850 MHz radio frequency radiation.  In a 1980

edition of IEEE proceedings, it was reported that radio frequency radiation may inactivate

enzymes or proteins that are involved in the repair process to correct DNA breaks and may also

be responsible for inhibiting inherent DNA repair processes.  In 1984, two researches, Dr. Chang

and Dr. Milham, made a presentation to the Annual Bioelectromagnetic's Society Conference in

which they revealed an increase in malignant tumors in rats after long term exposure to radio

frequency radiation in experiments they conducted.

76.

In 1994, L. Verschaeve documented evidence that human and rat blood samples exposed

to 450 and 954 MHz provided induced DNA breaks.  The cellular phone industry has insisted for

fifteen years that no such effect could be obtained from radio frequency radiation.  The research

21

02/13   19:14   CT   404 815 2424

by Verschaeve is but one of many similar reports which became known during 1994 and which supports the earlier findings of Cleary.

77.

In an alarming report, C.D. Cain disclosed in 1994 that 837 MHz radiation at a power density exposure level of 3.7 mW/cm2 produced a 40% increase in what researchers refer to as "focus Formation." These researchers explained at the 16th Annual Bioelectromagnetics Society that the radio frequency radiation was acting as a co-promoter for cancer formation.

78.

The Defendants knew, on or about June 12, 1994, that the notable researcher Henry Lai (and others) presented a report that indicated low-level (0.6 mW/g SAR) radio frequency radiation exposure at 2450 MHz resulted in memory deficits for experiments conducted with rats. This was a follow-up presentation of an article by Lai, Horita & Guy published only a few months earlier that provided substantially the same information. The memory deficits were observed as an inability of the rats to perform in a make experiment. In effect, the rats forgot their way around a familiar area. The researchers explain the effect as being caused by a decrease in brain activity. The low-level radiation exposure is extremely significant. Virtually all operators of cell phones subject themselves to such exposure and energy absorption while operating the phone. Further, the memory deficits do not stop when the exposure ends. Researchers have learned that the effect persists for five days or more.

79.

Late in 1994, Lai and Singh made known the results of their research which would have been received as conclusive proof that cellular phone radiation is capable of causing harmful biological effects. The researchers reported in the International Journal of Radiation Biology

22

that low level exposure to radio frequency radiation causes an increase in single and double strand breaks in DNA.

80.

Lai and Singh repeated their earlier experiment with similar results in 1996. In 1997, Repacholi published the results of his work that demonstrated that mice exposed to low levels of 900 MHz radiation exhibited a higher incidence of cancers than did their non-exposed laboratory counterparts.

81.

In late 1994, researchers reported on their observation that rats exposed to microwaves similar in intensity to those radiating from a WHHP's antenna appeared to experience single strand DNA breakage as a result of the exposure. The following year reports were published suggesting double strand DNA breaks in the same exposure scenario. Researchers had adapted the traditionally *in vitro* single cell gel assay in an *in vivo* situation. From this study, the Defendants knew or should have known that WHHPs had the capability to cause biological damage.

82.

In 1997, researchers were reporting biological effects in rats exposed head first to WHHP mediated RFR. These studies, though inconclusive, represented controlled studies showing biological effects from RFR exposure that were not heat induced.

83.

The WTR began to disseminate its findings in 1998 and 1999. Immediately thereafter, the WHHP industry, including the Defendants, negligently and wrongfully discontinued future funding of the program, which provides a database on the adverse effects of RFR.

23

84.

The cell phone industry, including Defendants, willfully and wantonly attempted to suppress WTR information from Brian Barrett, its other customers, the public and government regulatory agencies, by illegal threats and illegal acts of intimidation made upon Dr. George Carlo, a notable public health scientist, epidemiologist, lawyer, founder of Health Risk Management Group, and the individual appointed by the cell phone industry to study the health hazards associated with WHHP use.

85.

After leading the research effort regarding the health hazards associated with WHHP use for a period of six years, Dr. Carlo indicated that WHHPs may very well pose health risks to its user. In a response to these findings, the cell phone industry cut off Dr. Carlo's funding, attempted to discredit him with the scientific community, and attempted to ruin his career.

86.

The Defendants were aware of, or should have been aware of, the results of the above-described studies, and numerous other studies, outlining biological risks associated with WHHPs. Nevertheless, the Defendants failed to apprise Brian Barrett, their other customers, and the public that WHHPs pose biological risks. Defendants have also failed to adequately warn the public of the biological risks associated with WHHP use.

## MISREPRESENTATIONS BY THE DEFENDANTS

87.

At all times relevant to this Complaint, Defendants falsely and fraudulently misrepresented a number of facts regarding WHHPs, including the following:

24

a. The presence of adequate testing of RFR and potential biological effects on wireless phone users.

b. The adverse potential health effects that may be caused by their product.

88.

The Defendants have actively encouraged the increased use of WHHPs, while knowing the potential biological risks associated with their use.

89.

At all times relevant to this Complaint, the Defendants were aware of a myriad of scientific studies, clinical observations, and hypotheses by noted scientists and engineers.

90.

At all times relevant to this Complaint, the Defendants' researchers and engineers have known that RFR energy is absorbed and/or penetrates deeply into biological tissue, such as the human head and brain, and that RFR can have a serious biological impact on the WHHP user.

91.

At all times relevant to this Complaint, the Defendants were aware that the potential high level of radiation for WHHPs could cause cancer and other injuries. Defendants were aware of the clinical observations that many patients' brain tumors were located in an area where RFR from a WHHP's antenna would be deposited. Such observations were derived in part from studies available to the Defendants, as well as studies performed by Defendants.

92.

Research conducted by the Defendants, and research paid for directly by the Defendants, has repeatedly shown that the Defendants have and continue to manipulate science to the detriment of consumers by failing to reveal all relevant findings and by selectively withholding

25

02/13/01  19:15  CT

important public health information from the public and Brian Barrett.  Such information would have caused Brian Barrett and other prudent consumers to cease using the WHHPs.

93.

Defendants' strategy has been to aggressively market and sell these products and its related service by misleading and misinforming potential users about the products and by failing to protect users from serious dangers, which Defendants knew or should have known to result from the use of these products.

94.

Defendants widely and successfully marketed WHHPs in Atlanta, the State of Georgia, other states and as to some Defendants, nationally and internationally.  Defendants undertook an advertising blitz extolling the virtues of WHHPs in order to induce widespread use of the product.  The Defendants' marketing campaign consisted of advertisements on television, radio, and the Internet, promotional literature to be placed in the printed media and in other advertising media, and other promotional materials to potential users of WHHPs.

95.

The Defendants' advertising program, as a whole, by affirmative misrepresentations and omissions, falsely and fraudulently sought to create the image and impression that the use of WHHPs was safe with no potential for biological harm to the user.

96.

Defendants purposefully downplayed, understated, and/or did not state the health hazards and risks associated with WHHPs.  These Defendants, through promotional literature, deceived potential users of WHHPs by relaying positive information, including testimonials from satisfied users, and by manipulating statistics to suggest widespread acceptability, while downplaying,

26

understating, and/or not stating the known adverse and serious health effects. Defendants falsely and fraudulently kept relevant information from potential and actual WHHP users and minimized user concern regarding the safety of these products and services.

97.

Even though the Defendants were aware of the increasing demand for WHHPs and wireless service, they failed to conduct adequate testing, manipulated the results of other testing, concealed evidence that WHHP radiation is harmful, and suppressed scientific and medical research.

98.

Defendants have never fully and adequately warned the public about the risk of biological damage, such as, but not limited to, brain tumors, cancer, or genetic damage in human blood, and/or that the risk of injury can differ with the amount of use and the sensitivity of the user.

99.

The product warnings in effect during the period relevant to this Complaint were both substantively and graphically wholly inadequate to alert Brian Barrett and other customers of the risks associated with WHHP use.

100.

Defendants failed to publish adequate precautionary statements warning consumers as more information about possible adverse effects became available.

27

101.

Brian Barrett, a customer of the Defendants, and the general public were and continue to be misled and deceived by the Defendants into believing that these WHHPs operated at power levels too low to cause adverse health effects and/or are safe for public use.

102.

Defendants, who are members of the CTIA, have negligently and wrongfully continued to maintain that WHHPs are safe even though the studies proved otherwise.

103.

The Plaintiffs allege that the Defendants intentionally, negligently and wrongfully reported that the WHHPs were safe and that there was no danger from high levels of RFR emitted from WHHPs.

104.

As a result, Brian Barrett and the public have been grossly misled and misinformed regarding the biological risks associate with WHHP usage.

105.

Defendant Nokia's fraudulent and deceptive misrepresentations led customers and the public into believing that there were health care standards in place, when in fact, Defendant Nokia knew the following: (1) that human body absorbs non-ionizing electromagnetic energy; (2) that more radiation is absorbed the user's hand and head than is transmitted into space; and (3) that the absorbed radiation by the user's hand and head exceeded acceptable safe standards.

28

## COUNT I

## PRODUCT LIABILITY – STRICT LIABILITY

### 106.

Plaintiffs reassert paragraphs 1 through 105 as if same have been alleged and set forth verbatim herein.

### 107.

Defendants were manufacturers, suppliers and promoters of WHHPs and related services.

### 108.

The WHHPs and related services which were manufactured, sold, supplied and promoted by Defendants and which were placed in the stream of commerce by Defendants were defective and unreasonably dangerous.

### 109.

Plaintiff, Brian Barrett, purchased such goods and services from Defendants, without knowledge that same were defective.

### 110.

At all times, Plaintiff, Brian Barrett, used Defendants' goods and services in the manner for which they were intended.

### 111.

Plaintiff, Brian Barrett, contracted brain cancer as a result of the defective condition of Defendants' goods and services, said defect having existed at the time of manufacture of the products and continuing to exist through and including the time of injury to Plaintiff, Brian Barrett. As a result thereof, Defendants are strictly liable to Plaintiffs for the injuries sustained by Plaintiff, Brian Barrett, and the damages he has incurred thereby.

29

02/13/01  19:18    CT    444 815 2424

## COUNT II

## PRODUCT LIABILITY – FAILURE TO WARN AND
## DEFECTIVE MANUFACTURE AND DESIGN

### 112.

Plaintiffs reassert paragraphs 1 through 111 as if same have been alleged and set forth verbatim herein.

### 113.

Defendants were manufacturers, suppliers and promoters of WHHPs and related services.

### 114.

WHHPs and related services which were manufactured, supplied and promoted by Defendants and were placed in the stream of commerce, sold and promoted by Defendants were defective and unreasonably dangerous in that the design and use of WHHPs and their related services failed to include proper and necessary warnings regarding the potential health effects associated with the use of WHHPs.

### 115.

The WHHPs and related services were defective in that they were marketed and sold without adequate testing and/or a prior analysis of test information which would have shown that WHHPs and related services possessed and created serious potential harmful health effects. Full and proper warnings accurately and fully reflecting the scope and severity of such side effects should have been, but were not provided.

30

02/13/01  19:16    CTI    4.. 615 2424

116.

Defendants also failed to equip their WHHPs with proper and necessary safeguards and protections which were available, such as, but not limited to, a headset or speaker phone adapter which should have been furnished as a part of the WHHPs.

117.

Defendants also failed to provide adequate warnings or instructions of the dangers associated with such use as they knew, or should have known, of the risk of injury from WHHPs. Moreover, despite such knowledge, Defendants continued to promote the WHHPs and related services as safe, free of defects and free from dangers.

118.

The WHHPs and services as designed, manufactured and/or supplied by the Defendants were placed in the stream of commerce in a defective and unreasonably dangerous condition.

119.

As a direct result of the defective and unreasonably dangerous conditions of the WHHPs and related services, and due to the Defendants' failure to warn, Plaintiff, Brian Barrett, has developed cancer in his brain, has developed complications related to the cancer, has undergone radiation and therapy, and suffers from numerous impairments and disabilities, along with severe emotional distress and anxiety.

<u>COUNT III</u>

<u>NEGLIGENCE</u>

120.

Plaintiffs reassert paragraphs 1 through 119 as if same have been alleged and set forth verbatim herein.

31

02/13/01  19:16    CTI.        815 2424

121.

Defendants owed the Plaintiffs the duty of ordinary and appropriate care in the testing, manufacture, sale and promotion of the WHHPs and related transmission services. Defendants failed to fulfill that duty in numerous respects including, but not limited to, the following:

a.    Not adequately or properly testing WHHPs and the related services for health hazards associated with exposure to RFR emitted by said phones;

b.    By failing to analyze the significance of RFR studies and information already known at the time of marketing the products and/or services;

c.    By selling WHHPs which emit harmful RFR without adequate protection to protect the user; and

d.    By failing to provide adequate warning to the public, purchasers or users of the dangerous potential hazardous RFR emitted by the WHHPs.

122.

Defendants were negligent in that they failed to exercise ordinary care in the manufacture, sale, testing, quality assurance, quality control, distribution, advertising and warnings regarding WHHPs and related services, both prior to and after placing them in the stream of commerce.

123.

As a direct and proximate result of the Defendants' conduct as alleged herein, Plaintiff, Brian Barrett, has suffered permanent and total disability, has a terminal illness and has undergone multiple cancer therapies. Furthermore, Plaintiff, Brian Barrett, has sustained economic loss, emotional and psychological stress, including loss of earnings and diminution or loss of earning capacity, in an amount to be determined, requires reasonable and necessary health

32

care, attention and services and has incurred and will incur medical, health, incidental and related

expenses, and/or has been otherwise injured.

## COUNT IV

## BREACH OF EXPRESS WARRANTY

### 124.

Plaintiffs reassert paragraphs 1 through 123 as if same have been alleged and set forth

verbatim herein.

### 125.

Defendants expressly warranted that WHHPs and related services were safe for human

usage.

### 126.

Defendants' warranties constitute affirmations of fact, promises and descriptions

regarding the quality and safety of their products and services.

### 127.

Defendants breached these warranties in that they failed to eliminate or minimize health

hazards or possible health hazards from the RFR by designing WHHPs and/or by adequately

training users as to the appropriate method of using a WHHP.

### 128.

WHHPs do not conform to express representations because they are not safe and have

high potential for serious biological and health effects, including life threatening diseases.

33

02/13/01  19:17    CT    404 815 2424

## COUNT V

## BREACH OF IMPLIED WARRANTY

### 129.

Plaintiffs reassert paragraphs 1 through 127 as if same have been alleged and set forth verbatim herein.

### 130.

At the time Defendants marketed, sold, distributed and/or promoted WHHPs and related services for use by Plaintiff, Defendants knew of the use for which WHHPs and their services were intended and impliedly warranted the product and services to be of merchantable quality and safe and fit for such use.

### 131.

Plaintiffs relied upon the skill and judgment of the Defendants as to whether the WHHPs and related services were of merchantable quality and safe and fit for their intended use.

### 132.

Plaintiff, Brian Barrett, used the WHHPs and related services as intended and foreseen by Defendants.

### 133.

Defendants breached said warranty as such WHHPs and related services were not fit for their intended purpose and are unreasonably dangerous and unfit for that purpose.

34

02/13/01  19:17   CTI   494 815 2424

## COUNT VI

## CIVIL TORT CONSPIRACY

### 134.

Plaintiffs reassert paragraphs 1 through 133 as if same have been alleged and set forth verbatim herein.

### 135.

At all times relevant to this Complaint, the Defendants, formed confederacies and entered into agreements and/or tacit understandings to individually, jointly, and in conspiracy with each other, market unreasonably dangerous and defective WHHPs by collective means, including their collective conduct of suppressing their knowledge of the hazards of RFR emissions from WHHPs, and of placing into the stream of commerce dangerously defective WHHPs which caused an intentional, unpermitted touching of Plaintiff, Brian Barrett; an intent to defraud Plaintiff, Brian Barrett; and failed to warn Plaintiff, Brian Barrett, and the public of hazardous RFR emissions.

### 136.

The Defendants, acting collectively, reached a common agreement or understanding to market their defective WHHPs by:

    (a) marketing, producing and promoting the use of WHHPs without proper tests or warnings and without regard to the dangerous RFR emitted therefrom and the effects that the RFR would cause to Plaintiff, Brian Barrett, and other users;

    (b) suppressing, discouraging and/or retarding appropriate research, testing, regulation and public dissemination of information concerning RFR emissions and the effects those emissions would have on the public and Plaintiff, Brian Barrett; and

FEB 13 2001 19:22

(c) ignoring, disparaging, or misleading the public about medical and scientific data available to them which clearly indicated that RFR emissions from WHHPs are potentially hazardous to the health and safety of the public and Plaintiff, Brian Barrett.

### 137.

Defendants, jointly and in conspiracy with each other, knowingly committed the acts described in this Complaint, as well as other similar acts, in furtherance of their agreement or understanding to promote and market WHHPs.

### 138.

Defendants were aware of the dangers to those exposed to RFR emissions from WHHPs prior to the use of same by Plaintiff, Brian Barrett.

### 139.

At all times relevant, notwithstanding their knowledge of the hazards of RFR emissions from WHHPs, Defendants collectively lobbied various government officials and standard setting bodies to prevent regulation and control of WHHPs.

### 140.

At all times relevant, Defendants collectively spent thousands of dollars per year to finance selective research and to rebut growing evidence that RFR from WHHPs are hazardous to users.

### 141.

Notwithstanding their extensive knowledge of the hazards of RFR emissions from WHHPs, Defendants continued to promote WHHPs as appropriate for use to defraud the public and Plaintiff, Brian Barrett, into believing WHHPs are safe.

36

02/13/01 15:17   CT   404 815 2002

142.

Defendants, acting collectively, reached a common understanding or agreement so that to this very day, Defendants have failed to instruct and warn consumers about the hazards associated with RFR emissions from WHHPs notwithstanding their knowledge of such hazards.

143.

Defendants' collective, conspiratorial and tortious activities were knowingly and purposefully designed for their own economic and pecuniary benefit and were performed in furtherance of Defendants' respective joint business interests.

144.

At all times relevant, notwithstanding their knowledge of the hazards of RFR emissions from WHHPs, Defendants continued, and continue to this very day, to place into the stream of commerce dangerous and defective WHHPs.

145.

As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiff, Brian Barrett, has suffered permanent and total disability, has a terminal illness and has undergone multiple cancer therapies.  Furthermore, Plaintiff, Brian Barrett, has sustained economic loss, emotional and psychological stress, including loss of earnings and diminution or loss of earning capacity, in an amount to be determined, requires reasonable and necessary health care, attention and services and has incurred and will incur medical, health, incidental and related expenses, and/or has been otherwise injured.

146.

At all times relevant hereto, the Defendants actually knew of the defective nature of their products as herein set forth and continued to design, manufacture, market and sell their products

37

02/13/01  19:18   CT

so as to maximize sales and profits at the expense of public health and safety.  Defendants'
conduct exhibits such an entire want of care as to establish that their actions were a result of
fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm
to Plaintiff, Brian Barrett.  Plaintiff, Brian Barrett, is therefore entitled to punitive damages.

## COUNTY VII

## FRAUD

### 147.

Plaintiffs reassert paragraphs 1 through 146 as if same have been alleged and set forth
verbatim herein.

### 148.

Defendants made false representations of material facts to the public and the Plaintiffs.
The Defendants led the public and the Plaintiffs to believe under false pretenses that the WHHPs
were safe and did not emit an unsafe level of RFR.

### 149.

Defendants knew these representations were false or they made these representations
with such reckless disregard for the truth that the falsity can be imputed to them.

### 150.

Defendants were acting at all times relevant within the scope of their business for profit.

### 151.

Defendants deceived the public and the Plaintiffs for their own benefit.  This conduct by
the Defendants as described above was intentional, malicious, evil, extreme and outrageous
conduct, and was designated and calculated to cause Plaintiffs harm.  As a direct and proximate

38

02/13/01  19:18   CT        4 815 2424

result of Defendants' conduct, Plaintiffs were caused to suffer and will continue to suffer severe financial, emotional, psychological, and medical injury as set forth above.

152.

Defendants made these false misrepresentations in order to defraud the public and therefore the Plaintiffs.

153.

Particularly, Defendants committed fraud by:

(a) concealing evidence, as alleged in this Complaint, that would have demonstrated to the public and Plaintiff, Brian Barrett, that WHHPs are not safe for use;

(b) failing to adequately test WHHPs and inform the public that such WHHPs did not meet safety standards;

(c) misstating to the public and the Plaintiff, Brian Barrett, through advertising and testimonials that WHHPs are safe;

(d) failing to warn the public and Plaintiff, Brian Barrett, of research, as alleged throughout this Complaint, that indicated an association between RFR and WHHPs and cancer; failing to validate such research; and failing to replicate such research; and (5) otherwise committing fraud which upon information and belief will be proven through documentary evidence, which is in the possession of the Defendants.

39

02/13/01  19:18  CTI   434 815 2424

154.

Plaintiffs justifiably relied on the false representations made by the Defendants, were defrauded by Defendants' concealment and failure to conduct proper research, and as a direct result suffered damages.

155.

As a direct and proximate result of the Defendants' fraudulent conduct, Plaintiff, Brian Barrett, has suffered permanent and total disability, has a terminal illness, has undergone multiple surgeries and has undergone cancer treatments.  Furthermore, Plaintiff, Brian Barrett, sustained economic loss, emotional and psychological stress, including loss of earnings and diminution or loss of earning capacity, in an amount to be determined.  Plaintiff, Brian Barrett, requires reasonable and necessary health care, attention and services and has incurred and will incur medical, health, incidental and related expenses, and/or has been otherwise injured.

156.

At all times relevant hereto, the Defendants actually knew of the defective nature of their products as herein set forth and continued to design, manufacture, market and sell their products so as to maximize sales and profits at the expense of public health and safety.  Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to Plaintiff, Brian Barrett.  Plaintiff, Brian Barrett, is therefore entitled to punitive damages.

FEB 13 2001 19:24                                        202 785 8203        PAGE.42

## COUNT VIII

## CIVIL BATTERY

### 157.

Plaintiffs reassert paragraphs 1 through 156 as if same have been alleged and set forth verbatim herein.

### 158.

The Defendants, through their conduct and omissions, acting by and through their respective agents, servants, and/or employees, inflicted harmful or offensive contact to Plaintiff, Brian Barrett, by exposing him to RFR which they knew would cause biological changes and had the potential to cause permanent and significant health risks and effects.

### 159.

Based upon their conduct, Defendants intended to and did bring about and inflict this specific harm upon Plaintiff, Brian Barrett, which gave rise to injuries including his current medical condition and development of the tumor in his brain.

## COUNT IX

## LOSS OF CONSORTIUM

### 160.

Plaintiffs reassert paragraphs 1 through 159 as if same have been alleged and set forth verbatim herein.

### 161.

Plaintiff, Diana Barrett, is the spouse of Plaintiff, Brian Lane Barrett, was his spouse at the time he first began exhibiting symptoms and was diagnosed with a brain tumor, and she continues to be his spouse to the present.

41

162.

By reason of the injuries and medical condition suffered and sustained by Plaintiff, Brian Lane Barrett, and as a direct and proximate result thereof, Plaintiff, Diana Barrett, has been deprived of her husband's comfort, society and companionship, and such deprivation will continue into the future, to the general damage of Plaintiff, Diana Barrett.

163.

Defendants are therefore jointly and severally liable to Plaintiff, Diana Barrett, for general damages in an amount to be proven by the evidence at trial.

## COUNTY X

## PUNITIVE DAMAGES

164.

Plaintiffs reassert paragraphs 1 through 163 as if same have been alleged and set forth verbatim herein.

165.

All of the Defendants' conduct was willful, wanton and Defendants acted with reckless and conscious disregard for the consequences of their actions.

166.

As a result, each and all of the Defendants herein are liable for punitive and exemplary damages in such amount as a jury deems just and proper under the circumstances.

WHEREFORE, Plaintiffs pray as follows:

a.    That they have judgment against the Defendants, jointly and severally for all special and general damages in an amount to be determined at trial;

42

b.  That they recover punitive and exemplary damages of the Defendants in an amount to be determined at trial;

c.  That they have a trial by jury on all issues;

d.  That they recover costs of this action; and

e.  That this Court afford any other relief that it deems just and proper under the circumstances.

Respectfully submitted this 19ᵗʰ day of January, 2001.

WEINSTOCK & SCAVO,

By: _____

Michael Weinstock
Ga. Bar No. 746454
Richard Capriola
Ga. Bar No. 108880
Jan P. Cohen
Ga. Bar No. 174337
Daniel P. Sinaiko
Ga. Bar No 648848

3405 Piedmont Rd., N.E.
Suite 300
Atlanta, GA  30305
(404) 231-3999

Barrett, Brian\Complaint III

43