# EXHIBIT F

**IN THE SUPERIOR COURT
FOR THE
DISTRICT OF COLUMBIA**
Civil Division



**BALDASSARE S. AGRO**
77 W. Shenendoah Road
Howell, NJ 07731

000138-02

**DEBRAH A. AGRO**
77 W. Shenendoah Road
Howell, NJ 07731

FILED
ACTIONS BRANCH

FEB 2 6 2002

Superior Court
of the District of Columbia
Washington, D.C.

        Plaintiffs

v.



**MOTOROLA, INC.**
5725 E. River Road
Chicago, Illinois 60131
 '     **SERVE ON**: Resident Agent
        CT Corporation System
        208 South LaSalle Street
        Chicago, IL 60604

**NOKIA, INC.**
a/k/a Nokia Mobile Phones, Inc.
6000 Connection Drive
Irving, TX 75039
        **SERVE ON**: Resident Agent
        National Registered Agents, Inc
        905 Congress Avenue
        Austin, TX 78701

**QUALCOMM INCORPORATED**
a/k/a Qualcomm, Inc.
5775 Morehouse Drive
San Diego, CA 92121
        **SERVE ON**: Resident Agent
        Illinois Corp. Service Co.
        700 South 2nd St.
        Springfield, IL 62704

**AMERICAN NATIONAL STANDARDS
INSTITUTE**
a/k/a ANSI
1819 L Street NW, Suite 600
Washington, DC 20036

**SERVE ON**: Resident Agent
President & Chief Executive Officer
Dr. Mark W. Hurwitz
1819 L Street NW, Suite 600
Washington, DC 20036

**AT&T WIRELESS SERVICES INC.**
f/k/a AT&T Corporation
d/b/a AT&T Wireless Group a/k/a AT&T Wireless a/k/a AT&T Wireless PCS, L.L.C. a/k/a AT&T
Wireless PCS Inc. a/k/a AT&T Wireless Services PCS, L.L.C.
7277 164th Avenue N.E., Building I
Redmond, WA 98052.

    **SERVE ON**: Registered Agent
    Margaret Johnson
    16331 NE 72nd Way
    Redmond, WA 98073

**AT&T CORPORATION**
a/k/a AT&T
32 Avenue of Americas
New York, NY 10013

    **SERVE ON**: Registered Agent
    C T Corporation
    111 Eighth Avenue
    New York, NY 10011

**BELL ATLANTIC MOBILE, INC.**
f/k/a Bell Atlantic NYNEX Mobile, Inc.
180 Washington Valley Road
Bedminster. New Jersey 07921
    **SERVE ON**: Resident Agent
    The Corporation Trust Company
    1209 Orange Street
    Wilmington, Delaware 19801

**BELLSOUTH CORPORATION**
1155 Peachtree Street N.E.
Atlanta, GA 30309
    **SERVE ON**: Registered Agent
    Prentice Hall Corporation
    4845 Jimmy Carter Blvd.
    Atlanta, GA 30093

**CELLCO PARTNERSHIP** d/b/a Verizon Wireless Inc.
a/k/a Verizon, f/k/a Bell Atlantic Mobile, Inc.
d/b/a Bell Atlantic Nynex Mobile, Inc.
108 Washington Valley Rd.
Bedminster, New Jersey 07921
> **SERVE ON**: Resident Agent
> The Corporation Company
> 2711 Centerville Rd, Suite 400
> Wilmington, DE 19808

**CELLULAR ONE GROUP**
a/k/a Cellular One
5001 Lyndon B. Johnson Freeway, Suite 700
Dallas, TX 75244
> **SERVE ON:** Richard J. Lyons, President
> 5001 Lyndon B. Johnson Freeway, Suite 700
> Dallas, TX 75244

**CELLULAR TELECOMMUNICATIONS**
**AND INTERNET ASSOCIATION**
f/k/a Cellular Telecommunications Industry Association
a/k/a CTIA, Inc.
a/k/a CTIA
1250 Connecticut Avenue, N.W., Suite 200
Washington, D.C. 20036
> **SERVE ON**: Resident Agent
> John M. Townsend
> 1775 1st Street NW., Suite 600
> Washington, D.C. 20006

**CINGULAR WIRELESS, L.L.C.**
a/k/a Cingular Wireless
f/k/a Comcast Cellular Communications Inc.
a/k/a Comcast Cellular One a/k/a Cellular One
Glenridge Highlands Two
5565 Glenridge Connector
Atlanta, GA 30342
> **SERVE ON:** Registered Agent
> Neal Berinhout
> 5565 Glenridge Connector
> Atlanta, GA 30342

**INSTITUTE OF ELECTRICAL AND
ELECTRONIC ENGINEERS INC.**
a/k/a IEEE INC. a/k/a IEEE
3 Park Ave.
Floor 17
New York, NY 10016
    **SERVE ON:** Resident Agent
    Joel B. Snyder, President
    3 Park Ave., Floor 17
    New York, NY 10016

**SBC  COMMUNICATIONS INC.**
d/b/a Southwestern Bell Mobile Systems
175 East Houston
San Antonio, Texas 78205
    **SERVE ON:** Resident Agent
    C.T. Corporation Systems
    350 N. Saint Paul Street
    Dallas, Texas 75201

**SBC  WIRELESS L.L.C.**
f/k/a SBC Wireless Inc.
175 East Houston
San Antonio, Texas 78205
    **SERVE ON:** Resident Agent
    C.T. Corporation Systems
    350 N. Saint Paul Street
    Dallas, Texas 75201

**TELECOMMUNICATIONS INDUSTRY ASSOCIATION**
a/k/a TIA
1300 Pennsylvania Avenue, Suite 350
Washington, D.C.  20004 USA
    **SERVE ON:** Resident Agent
    Matthew J. Flanigan
    2599 Wilson Blvd., Suite 300
    Arlington, VA 22201

**VERIZON COMMUNICATIONS INC.**
f/k/a Bell Atlantic Mobile Inc.
1095 Avenue of Americas
New York, NY 10036

**SERVE ON:** Registered Agent
CT Corporation System
111 Eighth Avenue
New York, NY 10036

**VERIZON WIRELESS INC.**
f/k/a Bell Atlantic Nynex Inc.
f/k/a Bell Atlantic Mobile, Inc.
108 Washington Valley Rd.
Bedminster, New Jersey 07921
    **SERVE ON**: Resident Agent
    CT Corporation
    111 Eighth Avenue
    New York, NY 10011

**VODAFONE AIRTOUCH PLC**
f/k/a Airtouch Communications Inc.
a/k/a Airtouch
The Courtyard
2-4 London Rd.
Newbury, Berkshire RG141JX
United Kingdom
    **SERVE ON**: Resident Agent
    Chief Executive Officer
    Christopher C. Gent
    The Courtyard
    2-4 London Rd.
    Newbury, Berkshire RG141JX
    United Kingdom

**WESTERN WIRELESS CORPORATION**
3650 131st Avenue S.E.
Bellvue, WA 98006
    **SERVE ON**: Resident Agent
    Prentice Hall Corp. System
    1010 Union Avenue S.E.
    Olympia, WA 98501

**ABC CORPORATION**
a presently unidentified entity or entities

and

5

**JOHN DOE**
a presently unidentified individual or individuals

        **Defendants**

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT

Plaintiffs, Baldassare S. Agro and Debrah A. Agro, by and through their attorneys, bring the instant action against Defendants, MOTOROLA, INC.; NOKIA, INC. a/k/a NOKIA MOBILE PHONES INC.; QUALCOMM INCORPORATED a/k/a QUALCOMM, INC.; AMERICAN NATIONAL STANDARDS INSTITUTE a/k/a ANSI; AT&T WIRELESS SERVICES INC. f/k/a AT&T CORPORATION d/b/a AT&T WIRELESS GROUP a/k/a AT&T WIRELESS, a/k/a AT&T WIRELESS PCS, L.L.C. a/k/a AT&T WIRELESS PCS INC. a/k/a AT&T WIRELESS SERVICES PCS, L.L.C.; AT&T CORPORATION a/k/a AT&T; BELL ATLANTIC MOBILE, INC. f/k/a BELL ATLANTIC NYNEX MOBILE INC.; BELLSOUTH CORPORATION; CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS INC. a/k/a VERIZON f/k/a BELL ATLANTIC MOBILE INC. d/b/a BELL ATLANTIC NYNEX MOBILE INC.; CELLULAR ONE GROUP a/k/a CELLULAR ONE; CELLULAR TELECOMMUNICATIONS AND INTERNET ASSOCIATION f/k/a CELLULAR TELECOMMUNICATIONS INDUSTRY ASSOCIATION a/k/a CTIA INC. a/k/a CTIA; CINGULAR WIRELESS L.L.C. a/k/a CINGULAR WIRELESS f/k/a COMCAST CELLULAR COMMUNICATIONS INC. a/k/a COMCAST CELLULAR ONE a/k/a CELLULAR ONE; INSTITUTE OF ELECTRICAL AND ELECTRONIC ENGINEERS INC. a/k/a IEEE INC. a/k/a IEEE; SBC COMMUNICATIONS, INC. d/b/a SOUTHWESTERN BELL MOBILE SYSTEMS; SBC WIRELESS L.L.C. f/k/a SBC WIRELESS INC.; TELECOMMUNICATIONS INDUSTRY ASSOCIATION a/k/a TIA; VERIZON COMMUNICATIONS INC. f/k/a BELL ATLANTIC

MOBILE INC.; VERIZON WIRELESS INC. f/k/a BELL ATLANTIC NYNEX MOBILE INC. f/k/a

BELL ATLANTIC MOBILE INC.; VODAFONE AIRTOUCH PLC f/k/a AIRTOUCH

COMMUNICATIONS INC. a/k/a AIRTOUCH; WESTERN WIRELESS CORPORATION; ABC

CORPORATION; and JOHN DOE, (hereinafter collectively referred to as "Defendants"), and in

support state as follows:

### Introduction

1.      This is a civil action arising out of the manufacture and sale of cellular wireless hand

held telephones (hereinafter referred to by their customary name of "cell phones"), the use of cell

phones, and injuries resulting therefrom.  Hand-held cell phones are not to be confused with cellular

telephones and or other communication devices permanently mounted in automobiles, trucks, and

other public and/or private vehicles of all sorts and descriptions. The cell phones at issue in this case

are wireless cell phones currently in widespread use throughout the United States and the world

which are held up to the user's ear and against the user's head, thereby causing serious, permanent

and debilitating catastrophic injuries to the user.  The claims upon which relief is requested are:

Intentional Fraud and Misrepresentation, Negligent Misrepresentation, Strict Product Liability,

Failure to Warn and Defective Manufacture and Design, Negligence, Breach of Express Warranty,

Breach of Implied Warranty, Violation of the District of Columbia Consumer Protection Act of

2000, Conspiracy, Civil Battery, and Loss of Consortium.

2.      As set forth herein, the cell phone is not limited to the actual cellular wireless hand

held telephone itself, but, depending upon a particular allegation, may also consist of the entire

system(s) used to transmit voice and/or data transmissions from and/or to the cell phone, including,

but not limited to, base stations, antennas, land lines, and switching offices, all of which are necessary for the operation of a cell phone, as well as connection to and use of cell phone networks.

### Parties

3.    Plaintiff, Baldassare S. Agro (hereinafter referred to as "Mr. Agro") and Plaintiff, Debrah A. Agro, his spouse (hereinafter referred to as "Mrs. Agro"), are residents of the State of New Jersey.

4.    At all times relevant to this Complaint, the Defendant, MOTOROLA, INC. (hereinafter referred to as "MOTOROLA") is a corporation organized and existing under the laws of the State of Delaware, and has been authorized to do business under the laws of the District of Columbia, having its principal place of business in the State of Illinois at 1303 E. Algonquin Road, Schaumburg, Illinois 60196. At all times relevant herein, MOTOROLA, through its agents, distributors, servants and/or employees engaged in the manufacturing business of electromagnetic equipment, in particular, cell phones, and transacting business in the Plaintiffs' home state, as well as throughout the United States, including the District of Columbia, among other places.

5.    At all times relevant to this Complaint, the Defendant, NOKIA, INC. a/k/a NOKIA MOBILE PHONES, INC., (hereinafter referred to as "NOKIA") is a corporation organized and existing under the laws of the State of Delaware, and has been authorized to do business under the laws of the District of Columbia, having its principal place of business in the State of Texas at 6000 Connection Drive, Irving, Texas 75039. At all times relevant herein, NOKIA, through its agents, distributors, servants and/or employees engaged in the manufacturing business of electromagnetic equipment, in particular, cell phones, and transacting business in the Plaintiffs' home state, as well as throughout the United States, including the District of Columbia, among other places.

6.    At all times relevant to this Complaint, the Defendant, QUALCOMM INCORPORATED a/k/a QUALCOMM INC. (hereinafter referred to as "QUALCOMM"), is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.  At all times relevant herein, QUALCOMM through its agents, distributors, servants and/or employees engaged in the manufacturing business of electromagnetic equipment, in particular, cell phones, and transacting business in Plaintiff's home state, as well as throughout the United States, including the District of Columbia, among others places.

7.    At all times relevant to this Complaint, the Defendant, AMERICAN NATIONAL STANDARDS INSTITUTE (hereinafter referred to as "ANSI")  is a corporation organized and existing under the laws of the District of Columbia, having its principal place of business at 1819 L Street NW, Suite 600, Washington, DC 20036.  At all times relevant herein, ANSI through its agents, members, servants and/or employees is engaged in the establishment and setting of safety standards of Cell Phones, cellular telephone equipment and transmission services and represented the safety in the use of Cell Phones to the Plaintiffs and to cellular telephone owners and users nationally and internationally, including the District of Columbia, among other places.

8.    At all times relevant to this Complaint, the Defendant, AT&T WIRELESS SERVICES INC. (hereinafter referred to as "AT&T WIRELESS"), f/k/a AT&T CORPORATION d/b/a AT&T WIRELESS GROUP a/k/a AT&T WIRELESS a/k/a AT&T WIRELESS PCS, L.L.C. a/k/a AT&T WIRELESS PCS INC. a/k/a AT&T WIRELESS SERVICES PCS, L.L.C., is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 164th Avenue N.E., Building I, Redmond, Washington 98052.  At all times relevant

9

herein, AT&T WIRELESS, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United States including the District of Columbia.

9.     At all times relevant to this Complaint, the Defendant, AT&T CORPORATION, a/k/a AT&T (hereinafter referred to as "AT&T"), is a corporation organized and existing under the laws of the State of New York, having its principal place of business at 32 Avenue of Americas, New York, New York 10013.  AT&T is the principal owner of AT&T WIRELESS, which was formerly the wholly owned subsidiary of AT&T WIRELESS GROUP.  At all times relevant herein, AT&T, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United States including the District of Columbia.

10.     At all times relevant to this Complaint, the Defendant, BELL ATLANTIC MOBILE, INC., (hereinafter referred to as "BELL ATLANTIC") f/k/a BELL ATLANTIC NYNEX MOBILE, INC. (hereinafter referred to as "BELL ATLANTIC NYNEX"), is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 180 Washington Valley Road, Bedminster, New Jersey 07921.  At all times relevant herein, BELL ATLANTIC, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United States including the District of Columbia.

11.     At all times relevant to this Complaint, the Defendant, BELLSOUTH CORPORATION (hereinafter referred to as "BELLSOUTH") is a corporation organized and existing

10

under the laws of the State of Georgia, having its principal place of business at 1155 Peachtree Street N.E., Atlanta, Georgia 30309. BELLSOUTH has a forty percent (40%) membership interest in CINGULAR WIRELESS L.L.C., which is the surviving business entity of COMCAST CELLULAR COMMUNICATIONS, INC. a/k/a COMCAST CELLULAR ONE, a/k/a CELLULAR ONE. At all times relevant herein, BELLSOUTH through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United States including the District of Columbia.

12.    At all times relevant to this Complaint, the Defendant, CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS a/k/a VERIZON f/k/a BELL ATLANTIC d/b/a BELL ATLANTIC NYNEX, is a partnership organized and existing under the laws of the State of Delaware, having its principal place of business at 180 Washington Valley Road, Bedminster, New Jersey 07921. At all times relevant herein, VERIZON COMMUNICATIONS INC. is a fifty-five percent (55%) partner and VODAFONE is forty-five percent (45%) partner in CELLCO PARTNERSHIP. At all times relevant herein, CELLCO PARTNERSHIP, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United States including the District of Columbia.

13.    At all times relevant to this Complaint, the Defendant, CELLULAR ONE GROUP a/k/a CELLULAR ONE is a partnership organized and existing under the laws of the State of Delaware, having its principal place of business at 5001 Lyndon B. Johnson Freeway, Suite 700, Dallas, Texas 75244. At all relevant times herein, CELLULAR ONE GROUP has been comprised

11

of the following partners: SBC COMMUNICATIONS INC. d/b/a SOUTHWESTERN BELL MOBILE SYSTEMS; and AT&T d/b/a AT&T WIRELESS GROUP f/k/a McCAW CELLULAR COMMUNICATIONS INC. In or about 1999, WESTERN WIRELESS CORPORATION became a partner in CELLULAR ONE GROUP as well. Currently, CELLULAR ONE GROUP's interests have been divided into two surviving business entities: CINGULAR WIRELESS L.L.C. and WESTERN WIRELESS CORPORATION, which continues to operate under the assumed name CELLULAR ONE GROUP. At all times relevant herein, CELLULAR ONE GROUP, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United States including the District of Columbia.

14.    At all times relevant to this Complaint, the Defendant, CELLULAR TELECOMMUNICATIONS AND INTERNET ASSOCIATION f/k/a CELLULAR TELECOMMUNICATIONS INDUSTRY ASSOCIATION a/k/a CTIA, Inc. a/k/a CTIA (hereinafter referred to as "CTIA"), is the trade association existing under the laws of the District of Columbia, having its principal place of business at 1250 Connecticut Avenue, N.W., Suite 800, Washington, D.C. 20036, and CTIA has been conducting its business at all times relevant herein through its agents, servants, and/or employees is engaged in the establishment of safety standards of Cell Phones, cellular telephone equipment and transmission services and represented the safety in the use of Cell Phones to the Plaintiffs and to cellular telephone owners and users nationally and internationally, including the District of Columbia, among other places.

15.    At all times relevant to this Complaint, the Defendant, CINGULAR WIRELESS L.L.C. (hereinafter referred to as "CINGULAR WIRELESS") a/k/A CINGULAR WIRELESS f/k/a

COMCAST CELLULAR COMMUNICATIONS INC. a/k/a COMCAST CELLULAR ONE a/k/a

CELLULAR ONE, is a limited liability company organized and existing under the laws of the State

of Delaware, having its principal place of business at 1155 Peachtree Street N.E., Atlanta, Georgia

30309.   At all times relevant herein, CINGULAR WIRELESS, through its agents, distributors,

servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone

equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United

States including the District of Columbia.

      16.    At all times relevant to this Complaint, the Defendant, INSTITUTE OF

ELECTRICAL AND ELECTRONIC ENGINEERS INC., a/k/a IEEE INC. a/k/a IEEE (hereinafter

referred to as "IEEE") is a corporation organized and existing under the laws of the State of New

York, having its principal place of business at 3 Park Avenue, Floor 17, New York, NY 10016.  At

all times relevant herein, IEEE through its agents, members, servants and/or employees is engaged

in the establishment and setting of safety standards of Cell Phones, cellular telephone equipment and

transmission services and represented the safety in the use of Cell Phones to the Plaintiffs and to

cellular telephone owners and users nationally and internationally including the District of

Columbia, among other places.

      17.    At all times relevant to this Complaint, the Defendant, SBC COMMUNICATIONS

INC. d/b/a SOUTHWESTERN BELL MOBILE SYSTEMS (hereinafter referred to as "SBC

COMMUNICATIONS"), is a corporation organized and existing under the laws of the State of

Delaware, having its principal place of business at 175 East Houston Street San Antonio, Texas

78205. SBC COMMUNICATIONS has been a partner in CELLULAR ONE GROUP and currently

is a sixty percent (60%) member in CINGULAR WIRELESS, which is the surviving business entity

13

of COMCAST CELLULAR COMMUNICATIONS INC. a/k/a COMCAST CELLULAR ONE a/k/a
CELLULAR ONE. At all times relevant herein, SBC COMMUNICATIONS, through its agents,
distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular
telephone equipment in particular, cell phones, and transacting business in Plaintiffs' home state, as
well as throughout the United States, including the District of Columbia, among others places.

18.    At all times relevant to this Complaint, the Defendant, SBC WIRELESS L.L.C. f/k/a
SBC WIRELESS INC.  (hereinafter referred to as "SBC WIRELESS"), is a limited liability
company organized and existing under the laws of the State of Delaware, having its principal place
of business at 175 E. Houston Street, San Antonio, Texas 78205.  At all times relevant herein, SBC
WIRELESS, through its agents, distributors, servants and/or employees engaged in the sale and/or
promotion of Cell Phones, cellular telephone equipment and transmission services in particular, cell
phones, and transacting business in Plaintiffs' home state, as well as throughout the United States,
including the District of Columbia, among others places, by virtue of licensing agreements with
CELLULAR ONE GROUP and/or otherwise.

19.    At all times relevant to this Complaint, the Defendant, TELECOMMUNICATIONS
INDUSTRY ASSOCIATION a/k/a TIA (hereinafter referred to as "TIA"), is the trade association
existing under the laws of the State of Illinois, having its principal place of business at 1300
Pennsylvania Avenue, Suite 350, Washington, D.C. 20044.  At all times relevant herein, TIA,
through its agents, servants, and/or employees conducted its business and represented the safety in
the use of Cell Phones to the Plaintiffs and to cellular telephone owners and users nationally and
internationally, including the District of Columbia, among other places.

14

20. At all times relevant to this Complaint, the Defendant, VERIZON COMMUNICATIONS INC., f/k/a BELL ATLANTIC MOBILE INC. (hereinafter referred to as "VERIZON") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 1095 Avenue of Americas, New York, New York 10036. VERIZON is a fifty-five percent (55%) partner in CELLCO PARTNERSHIP. At all times relevant herein, VERIZON, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United States, including the District of Columbia, among other places.

21. At all times relevant to this Complaint, the Defendant, VERIZON WIRELESS INC., f/k/a BELL ATLANTIC NYNEX f/k/a BELL ATLANTIC (hereinafter referred to as "VERIZON WIRELESS"), is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 108 Washington Valley Rd., Bedminster, New Jersey 07921. At all times relevant herein, VERIZON WIRELESS, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United States, including the District of Columbia, among other places.

22. At all times relevant to this Complaint, the Defendant, VODAFONE AIRTOUCH PLC f/k/a AIRTOUCH COMMUNICATIONS INC. a/k/a AIRTOUCH (hereinafter referred to as "VODAFONE"), is a corporation organized and existing under the laws of the United Kingdom, having its principal place of business at The Courtyard, 2-4 London, Newbury, Berkshire RG14 1JX, UK. VODAFONE is a forty-five percent (45%) partner in CELLCO PARTNERSHIP. At all times

relevant herein, VODAFONE, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United States including the District of Columbia, among other places.

23.    At all relevant times to this Complaint, the Defendant, WESTERN WIRELESS CORPORATION (hereinafter referred to as "WESTERN WIRELESS") is a corporation organized and existing under the laws of the State of Washington, having its principal place of business at 3650 131st Avenue S.E., Bellvue, Washington 98006.    At all times relevant herein, WESTERN WIRELESS, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of Cell Phones, cellular telephone equipment and transmission services in the Plaintiffs' home state, as well as, throughout the United States including the District of Columbia, among other places.

24.    Defendant, ABC CORPORATION (hereinafter referred to as "ABC") represents other corporations, partnerships, limited liability companies, and/or other business entities which have or may have had a formal or casual business affiliation or ownership interest with one or more of the named defendants, as well as, other corporations or business entities, such as, but not limited to, component manufacturers and suppliers, whose identities are at present unknown, that otherwise participated with the named Defendants in the wrongdoing described in this Complaint. The named defendants are large complex corporations tiered with a system of complex interlocking corporations, partnerships, distributors, component manufacturers, and other business entities which in many cases operate under many trade names which makes identification difficult without discovery, thereby requiring the necessity of an "ABC" CORPORATION defendant(s). Once the

16

identity of these other corporations or business entities is established, this Complaint will be amended to name the additional wrongdoers as parties.

25.    Defendant, JOHN DOE (hereinafter referred to as "DOE") represents an individual or individuals whose identities are at present unknown, who otherwise participated with the named Defendants in the wrongdoing described in this Complaint. Once the identity of these other individuals is established, this Complaint will be amended to name the additional wrongdoers as parties.

### General Allegations

### Injuries Caused by Cell Phones to User

26.    Mr. Agro is a 42 year-old male who is permanently disabled.  Mr. Agro suffers from excessive fatigue, cognitive changes, vomiting, debility, visual impairment, severe headaches, heightened sensitivity to noise, memory problems, psychological and emotional stress, pain and suffering, brain cancer, and trauma associated with brain surgery, brain tumor and cancer, among other injuries.  These adverse health effects are as a direct result of irradiation of his brain by radio frequency (RF) radiation which was emitted from cell phones to him as a user.

27.    Mr. Agro is married and has three dependent children. Mr. Agro has been a successful business owner in the mortgage industry for the past 12 years, and is currently the President of Continental Mortgage Bankers earning a portion of the total profits. Due to his illness, Mr. Agro was forced to miss substantial amounts of time from his employment, and struggles daily to overcome his disabilities in order to continue his employment, however, he has been unable to return to work full-time due to the permanent disabilities he suffers as a result of the brain cancer and tumor.  Mr. Agro currently collects social security disability pay in order to compensate for the loss of income.

28.    Mr. Agro was diagnosed with a malignant Glioblastoma occupying the right frontal lobe and he  underwent initial craniotomy on January 14, 2000.  Subsequently, Mr. Agro has undergone extensive radiation therapy, chemotherapy and other therapies.

29.    Mr. Agro's life is plagued with the results of the cancer and the associated effects of the brain tumor.  He must have blood tests taken every 4-8 weeks and an MRI every four months to detect any tumor regrowth. Mr. Agro is cognizant of the fact that his condition might worsen at any time and his life expectancy is very short.

30.    The course of events which led up to Mr. Agro's injuries originates from what amounts to a  typical and routine retail sale of a cell phone, or in his case cell phone(s).

31.    In or about 1992, through approximately 1993, Mr. Agro bought his first cell phone, a Motorola Cellular Telephone with service through Comcast Cellular, n/k/a SBC Communications. The purchase included the cell phone, connection to the Defendants' cell phone network, and/or other things necessary to allow Mr. Agro to communicate via his cell phone.

32.    In or about 1993, through the first quarter of 1998, Mr. Agro used a Nokia Cellular Telephone with service through Bell Atlantic Nynex, n/k/a Verizon Wireless.

33.    Thereafter, from 1998 through January 2000, Mr. Agro began using a Qualcomm Cellular Telephone with service through Bell Atlantic Mobile, n/k/a Verizon Wireless.

34.    As a result of using these cell phones, Mr. Agro was exposed to non-ionizing non-heat effect radio frequency radiation (hereinafter referred to as "RF radiation") which caused the aforementioned adverse health effects and thereby caused the devastation that he and his family have had to bear.

35.     As a direct, natural, proximate and foreseeable result of the Defendants' conduct as alleged herein, Mr. Agro has suffered permanent disability, has a terminal illness and has undergone multiple cancer therapies. Furthermore, Mr. Agro has sustained pain and suffering, emotional and psychological stress, economic loss, including loss of earnings and diminution or loss of earning capacity, requires reasonable and necessary health care, attention and service and has incurred and will incur medical, health, incidental and related expenses, and/or has been otherwise injured.

36.     Cellular communication is achieved by transmission of information on air waves back and forth between the cell phone and a nearby cell site. The airwaves used for cell phone transmissions are in the 825-845 MHz radio frequency (RF) range. Two modes of transmission are used by cellular systems, analog and digital. In both cases, these airwaves are modulated with an electromagnetic wave representation of the speech information. This modulation often includes extremely low frequency ("ELF") components either from the speech itself in the case of analog transmission or from the encoding scheme in the case of digital  transmission. To prevent interference to and from other users of the cellular system, a control unit at the cell site instructs the cell phones within its range to increase or decrease transmitting power when making and during a call.

37.     Cellular telephones were originally installed in automobiles, used external antennas and operated at three watts of power. Users of these vehicle-mounted cellular telephones were insulated from the electric fields, magnetic fields and electromagnetic fields (collectively called RF radiation) generated by this equipment by the shell of the automobile and by distance of the user from the radiating elements.

19

38.    Defendants, CINGULAR WIRELESS, BELL ATLANTIC NYNEX and BELL ATLANTIC MOBILE and/or their identities in interest were the operators of a cellular system in New Jersey. This system was designed, constructed and installed to serve vehicle mounted three watt units. The Defendants began manufacturing and marketing lower powered cell phones in approximately 1986. Thereafter, some of Defendants' cell sites were, from time to time, redesigned to be "portable compatible," however, Plaintiffs are informed and believe and thereon allege that during all times herein relevant, most of the cell sites had not been upgraded. As a result, cell phones using this cellular system were normally operated at or near their maximum power.

39.    The cell phone market operates in a classic oligopolistic fashion. Almost all cell phones are purchased directly from cell phone companies or through one of their agents. Cellular service and cell phones are sold as a package and in the package, the price of the cell phone is fixed below cost in order to discourage any cell phone manufacturers from trying to sell directly to consumers. Agents are given a rebate to cover the below cost sale of the cell phone. This tying arrangement gives cell phone companies, together with CTIA de facto control over the cell phone equipment market and the power to accept or reject cell phones that do not meet their specifications. This market power was acknowledged in a July 24, 2001, article in the San Diego Union Tribune, a representative of Motorola is quoted as saying cell phone manufacturers compete on style, on brand, on their relationship with wireless operators." (Emphasis added). This control over the manufacturing of cell phones is further enforced by CTIA's testing program that grants the manufacturer the right to place CTIA's seal of approval on the approved cell phone. Furthermore, the Defendant carriers test cell phones before allowing them to be used on their cellular systems.

Thus, at all times herein mentioned, the defendants were in control of the design, assembly, platform for usage, manufacture, marketing and sale of cell phones.

40.     The power density of RF radiation from a cell phone is approximately two billion times greater than occurs naturally in the environment. Because the cell phone used next to the head, the RF radiation penetrates two and one half (2 ½) inches or more into the brain. A portion of the brain is enveloped in RF radiation from the front to the back of the skull. This area is called "the plume."

41.     The cellular transmit frequencies are very absorptive and penetrate deep into the tissue where heating effects occur. Medical equipment used for hypothermia/diathermy treatments use nearby frequencies (750 MHz and 915 MHz) because they are ideally suited for delivering heat deep into the brain without causing any skin heating.

42.     The thermal effects of RF radiation are well established. These thermal effects are by the specific absorption rate ("SAR"), which represents a value of energy absorption per unit when a human body is exposed to electromagnetic waves. There is no dispute that a temperature of 0.5C or more in the sensitive brain tissue can cause tissue destruction, inhibition of cell growth and increase in cell membrane permeability, all of which are precursors to cancer.

43.     "Hot spots" are created by the convergence of airwaves by reason of reflection and refraction off of the irregular surfaces of the human head and attenuation by passage through different layers of skin, fat, bone, etc., much like a magnifying glass can focus the rays of the sun. These hot spots are as much as 200 times higher than the RF radiation level from the cell phone and results in harmful heating of the brain. Use of a cell phone in a vehicle increases the level of RF exposure, and metal-framed eyeglasses, metal implants, orthodontic braces and metallic jewelry

worn about the head may modify the radiation absorption also resulting in "hot spots" of high energy concentration in the brain.

44.    The Defendants' testing, both before and after the introduction of cell phones in 1986, revealed that cell phones could not pass the then current SAR safety standards established by independent and government agencies. The Defendants ignored these safety standards on the absurd and baseless ground that "the peculiar nature of the electromagnetic energy" in close proximity to the human head prevented radiation from entering the brain. Relatively inexpensive design changes could have been made to reduce or eliminate the penetration of RF radiation into the brain of the user. Defendants' elected to produce cell phones without addressing the RF radiation problem.

45.    SAR testing of new cell phones was mandated by the FCC on August 1, 1996, who left it to the manufactures to design the testing methods and self-certify the results. It is generally acknowledged that the SAR testing methods used by the Defendants are not a reliable test for thermal effects of RF radiation. Such SAR tests do not reveal "hot spots."

46.    SAR does not apply to the non-thermal effects of RF radiation. The scientific studies of the non-thermal effects of RF electromagnetic waves on tissue show DNA breaks, interruptions in communications between cells that may lead to uncontrolled cell growth, major physiological changes, interference with the blood brain barrier, mutations of DNA and chromosome structure, increase in calcium efflux, adverse impact on the immune system, destruction of blood cells, and other effects. These studies show that the non-thermal effects of RF radiation are initiators.

### Defendants' Knowledge of Health Risks

47.     At all times herein mentioned, Defendants' were aware of numerous studies and experiments that demonstrated the health hazards of RF radiation dating back to the late 1940's. Defendants' prior knowledge of these studies included, but was not limited to, the following:

(a)     In 1928, Helen Hosner, a researcher at the Albany Medical College, showed that radio waves were capable of heating body tissue in a study investigating the effects of experimental short wave radio transmitters on workers at a General Electric research facility. Her work entitled "Heating Effects Observed in a High Frequency Static Field," was published in Science.

(b)     In a 1948 article published in the *Archives of Physical Medicine & Rehabilitation*, Oct. 1962, Pp. 502 −507, it was reported that radiation at 2,450 MHz was "highly productive in producing lenticular opacities."

(c)     In 1952, researchers noted that "experiments in which the head area alone was directly irradiated suggests that the fatal outcome was the result of an excessive rise in brain temperature. The lethal effects of irradiation to a limited area of the body are different from those in which the entire animal is exposed," That warning was published after researchers had exposed laboratory rats to a few seconds of intense exposure of radio frequency radiation. The warning was published in Microwave Radiation: Biophysical Considerations and Standards Criteria, IEEE Transactions on Biomedical Engineering.

(d)     In 1955 researchers Schwa and Pierson published their work that radio frequency energy, in a broad range from 500 MHz to 1000 MHZ is preferentially deposited beyond the skull and absorbed into the brain.

23

(e)    In 1962, it was known in the scientific community that radio frequency energy is efficiently absorbed into human tissue and is capable of producing undesirable effects.

(f)    It was well known in the scientific and medical communities in the 1970's that an antenna is the most efficient means of depositing energy into the human body and penetrating human tissue.

(g)    In 1971, A.W. Guy published in *IEEE Transaction in Microwave Theory and Techniques,* Vol. MET-19, No. 2, Feb., 1971, Pp. 205 -214, that in order to obtain selective heating, "hot spot" heating, it is necessary to expose the tissue to the near zone fields of the energy source, namely the antenna. From this experimental data at 433 MHz, 750 MHz, and 918 MHz the research confirmed that energy is readily absorbed from the induction fields in the near zone. The absorption within the brain was found to be about 20 times greater than that of the skull and subcutaneous fat.

(h)    In 1972, in a study by I. J. Ball, it was demonstrated that frequencies between 700 megahertz and 1000 megahertz interact most efficiently with human tissue to yield the greatest energy absorption and that the temporal lobe of the brain is the most sensitive area of the body to this type of radiation. The work performed by Ball was published in IEEE Transactions on Microwave Theory and Techniques, *IEEE Transactions on Microwave Theory and Techniques*, Vol. MET-30, No. 7, July 1982, Pp. 1090 – 1093, a publication accepted as authoritative in the medical and scientific communities.

(i)    In March of 1976, the U.S. Defense Intelligence Agency reviewed the biological effects of non-thermal exposure to microwave and RF radiation. In part this review stated:

> "The potential for development of a number of antipersonnel applications is suggested by the research published in the USSR, East Europe and the West. Sounds and possibly even words which appear to be

24

originating intra-cranially can be induced by signal modulation at very low average power densities. Combinations of frequencies and other signal characteristics to produce other neurological effects may be feasible in several years. The possibility of inducing metabolic disorders also suggested. Animal experiments reported in the open literature have demonstrated the use of low level microwave signals to produce death by heart seizure or by neurological pathologies resulting from breaching of the blood-brain barrier."

(j)    In 1977, J.C. Lin published the results of his research in IEEE Transaction on Microwave Theory and Techniques. Results revealed that because microwave absorption occurs in a very short time there is little chance for heat conduction to take place, the conduction of heat takes much longer. At "hot spots" the inability of biological tissue to get rid of excess heat quickly and efficiently may be yet another mechanism leading to destructive exposure.

(k)    Research confirmed that "hot spot" absorption is dependant on the diameter of the head model which was used. *IEEE Transactions on Biomedical Engineering, March 1976, Pp. 168 - 172.* As the diameter decreased the absorption effect became more pronounced. Most notably, the greatest absorption enhancement occurs at frequencies between 800 MHz to 1000 MHz.

(l)    In 1977, OP. Gandhi published a study in *Radio Science*, Nov. - Dec. 1977, Pp. 39-47, which confirmed that radiation absorption enhancement occurs when subjects are close to reflecting surfaces. Gandhi reported a measured energy absorption enhancement factor of as much as 27 in close proximity to corner shaped reflectors and about 4.7 for flat reflectors.

(m)    In 1978, Motorola studied the efficiency of the antenna and learned that the maximum Specific Absorption Rate exists at the antenna "feed point."

25

(n)    Long before the introduction of cell phones, researchers provided data indicating that children absorb approximately 50% more radiation within their heads than do adults. The research performed by C.H. Durney, reported in IEEE Transactions on Microwave Theory and Techniques in 1979, only took into consideration the plain wave far field exposures and did not include any of the enhancement effects that are introduced by the near zone operation of cell phones.

(o)    In 1979, researchers Sheppard, Bawin and Adey confirmed in a published article that low intensity modulated (16 MHz) 450 MHz fields produced modified calcium efflux through brain cell membranes. The researchers observed the effect for power density levels lower than 2.0m W/cm2. The work was published in *Radio Science*, Vol. 14, No. 6S, Nov. - Dec. 1979, Pp. 141 - 145.

(p)    In 1979, in an experiment by J.L. Meyerhoff,  laboratory rats were killed quickly to prevent unwanted changes in brain structure. It was reported that "it is preferable to focus the microwave energy into the head of the animal, thereby increasing the efficiency of the energy delivered to the brain." The experiment was published in *IEEE Transactions on Microwave Theory and Techniques* Meyerhoff,, Vol. 68, No. 1, Jan. 1980, Pp. 155 – 159.

(q)    The cell phone industry conducted extensive research in the early 1980's on the effects of antennas and discovered that there is a large amount of stored energy that is disposed immediately around the antenna of a cell phone.

(r)    In 1980, Adey published follow-up research demonstrating modifications in brain cells at low level radiation exposure. Adey also reported that weak modulated frequency radiation results in major physiological changes. The work was published in Proceedings of the IEEE, January 1980.

26

(s)    In 1981, a Motorola researcher was quoted in *IEEE Transactions on Vehicular Technology*, Vol. VT-30, No. 4, Nov. 1981, Pp. 161-174, "the proposed standard recognizes the possibility of encountering fields higher than the maximum of the protection guides in the close vicinity of low power radiators, like portable communication equipment. For this reason, an exclusion clause for devices operating at 1 GHz or less end with less than 7 watts output power has been proposed."

(t)    At the same time, Motorola researchers publicly stated "the Radio Frequency Protection Guides of the American National Standards Institute at 750 MHz would be violated at .03 centimeters distance by a resident dipole radiating about 1mW and at .5 centimeters distance by a radiated power of 4mW." "A resident dipole provides the most favorable condition of minimum stored energy around the antenna." The researchers conceded that "a rigorous enforcement without exclusion of the RF protection guides would render portable radios practically useless."

(u)    In an article published in 1981 in *IEEE Transactions of Vehicular Technology*, Vol. VT-30, No. 4, Nov. 1981, Pp. 161-174, a prominent Motorola employee stated, "this paper addresses the question of how long the power radiated by a dipole has to be so that the field near the antenna never exceeds ANSI-Proposed Protection Guides for distances greater than .3 centimeters, which is the spacing which at times separates the antenna from the head of the portable radio user. Radiated power of a few milliwatts is enough to exceed the proposed radiation protection guides at 750 MHz. Such reticence in accepting the clause probably resides in the fact that the near field of antennas is largely un-investigated." [The near field is the plume]. At the same time, a prominent Motorola researcher stated, "the study of the near field has been substantially neglected." The same

27

prominent Motorola researcher stated, "dipole antennas, although extensively used in portable and mobile communications, have not been carefully investigated in the near field."

       (v)    In 1981, during the time that the exclusion of cell phones was debated within the ANSI Committee, a Motorola researcher was quoted as stating, "strict enforcement…technically forbids the exposure to a resident dipole about 19 centimeters long, radiating 1mW."

       (w)    In 1982, Motorola researchers found that as little as 250 micro Watts radiated power would be enough to exceed the safety standards established by the ANSI when using the helix antenna as the radiator for near zone exposure. The study was published in IEEE Transactions on Vehicular Technology, Vol. Vt-31, No. 4, Nov. 1982, Pp. 173 -185.

       (x)    The Motorola researchers found that the exposure to the helical antennas yields a power density of as much as 127mW.cm2 when the antenna is placed about 1 centimeter distant. The radiated power was only .02 Watts, which is thirty times less than what is radiated from a portable cell phone.

       (y)    In 1984, in an article published by Microwave News, there was a report of a 1984 study by the United States Air Force in which it was found by Dr. Vernor of the University of California "findings of excess malignancies in the exposed animals is provocative" after being exposed to RF radiation.

       (z)    In 1986, the United States Air Force sponsored a study by A.W. Guy in which 100 rats were irradiated over a three year period and compared to 100 rats that were not exposed to radiation but were otherwise treated identically. After the experiments were completed, the researchers reported that 19 malignant tumors developed in the exposed rats as compared to 5 in the control group rats. The researchers claimed that such a difference was "statistically highly

significant." They also stated, "at face value this last finding suggests that low levels of microwave radiation can cause cancer in mice." Remarkably, the Environmental Protection Agency ("EPA") accepted a report by the same researchers who suddenly "corrected" their conclusions. The EPA in 1986 stated that evidence of carcinogenicity must be confirmed to a specific tumor type.

(aa)    In 1989, Stephen Cleary presented a review of the state of research related to non-thermal interactions and effects of RF radiation. He concluded, "cellular studies provide convincing evidence that RF radiation, and other types of electric or magnetic fields, can alter living systems via direct non-thermal mechanisms, as well as via heating."

(bb)    In 1992, a project performed by A. Maes confirmed a marked increase in the frequency chromosomal aberrations and the presence of micro nuclei in peripheral blood alter exposed to 2,450 MHz radiation.

(cc)    In 1992, F. Montecchia published an article in IEEE Transactions Biomedical Engineering that some antennas are specifically designed to USC the non radiating induction energy (around the antenna) for penetration into humans. One such antenna was specifically developed to provide an improved method for depositing energy into tissue for hypothermia treatment.

(dd)    In 1992, it was reported in *Microwave News*, a news publication widely circulated and read by the scientific and medical community, that Keith Angstadr, an antenna technician, was treated at Johns Hopkins University for exposure to RF radiation which led to his loss of night vision and color blindness. The retinas of his eyes had sustained 5mW/cm2 of continuous wave radiation.

(ee)    The medical and scientific communities were well aware of the extensive research published and reported throughout the 1950s and 1960s of the dangers of causing burns

when RF radiation is applied over a bony prominence. It was revealed that non-uniformities such as bone ridges and irregular fat layers caused the energy to be absorbed non-uniformly within the body or head.

(ff)    In 1993, N. Kuster published an article in *IEEE Transactions on Biomedical Engineering*, Vol. 40, No. 7, July 1993, Pp. 611 - 620, which demonstrated the very high level of energy absorbed into the head and brain in the area close to the location of the antenna. Kuster reported that the maximum SAR measured models of human heads exposed to 1 Watt of energy was 5mW/g. The antenna employed was approximately one inch from the head of the model.

(gg)    In December 1993, Chergrinets reported in *Bioelectromagnetics*, Vol. 14, No. 6, 1993, Pp. 495 - 501, that pulsed 150 to 300 MHz at 5mW/cm2 caused chromosomal changes in human peripheral lymphocytes and whole blood cells.

(hh)    The Defendants knew that early in 1994 research performed in India by Sarkar, et al, confirmed that DNA modifications result from low-level exposure to RF radiation. Clearly, if RF radiation can rearrange the DNA in tissue then it can initiate cancer.

(ii)    In 1994, Henry Kues, a Johns Hopkins researcher, reported cell destruction and cell death comparable to that which would he expected from ultraviolet radiation was reported from exposure of rhesus monkeys to 1,250, 2,450 and 2,850 MHz RF radiation. In a 1980 edition of IEEE Proceedings, it was reported that RF radiation may inactivate enzymes or proteins that are involved in the repair processes. In 1984, two researchers, Dr. Chang and Dr. Milham, made a presentation to the Annual Bioelectromagnetic Society Conference in which they revealed an increase in malignant tumors in rats after long term exposure to RF radiation in experiments they conducted. 16th Annual Bioelectromagnetic Society Meeting, June 12 -17, 1994, abstract book, P.7

(jj)    In 1994, L. Verschaeve documented evidence that human and rat blood samples exposed to 450 and 954 MHz RF radiation provided induced DNA breaks. The research by Verschaeve is but one of many similar reports that became known during 1994 and which supports the earlier findings of Cleary. 16th Annual Bioelectromagnetic Society Meeting, June 12 - 17, 1994, abstract book, p.5.

(kk)    In an alarming report, D.C. Cain disclosed in 1991 that 837 MHz RF radiation at a power density exposure level of 3.7mW/cm2 produced a 40% increase in what researchers refer to as "focus Formation." These researchers explained at the 16th Annual Bioelectromagnetic Society Meeting, June 12-17, 1994, abstract book, p.69, that the RF radiation was acting as a co-promoter for cancer formation.  16th Annual Bioelectromagnetics Society Meeting, June 12 - 17, 1994, abstract book, P.69

(ll)    On or about June 12, 1991, the notable researcher Henry Lai, (and others) presented a report that indicated low-level (0.6mW/g SAR) RF radiation exposure at 2450 MHz resulted in memory deficits for experiments conducted with rats. This was a follow-up presentation of an article by Lai, Horita & Guy published only a few months earlier that provided substantially the same nation. The memory deficits were observed as an inability of the rats to perform in a maze experiment, in effect, the rats forgot their way around a familiar area. The researchers explain the effect as caused by a decrease in brain activity. The low-level radiation exposure is extremely significant. Virtually all users of cell phones subject themselves to such exposure and energy absorption while operating the cell phone.  Further, the memory deficits do not stop when the exposure ends. Researchers have learned that the effect persists for five days or more.

(mm)   In late 1994, Lai and Singh made known the results of their research which should have been received as conclusive proof that cell phone radiation is capable of causing harmful biological effects. The researchers reported in the *International Journal of Radiation Biology* that low level exposure to RF radiation causes an increase in single and double strand breaks in DNA.

(nn)     Lai and Singh repeated their earlier experiment with similar results in 1996. In 1997, Repacholi published the results of his work that demonstrated that mice exposed to low levels of 900 MHz RF radiation exhibited a higher incidence of cancers than did their non exposed laboratory counterparts

(oo)     During a massive six-year study funded by CTIA, the epidemiologist in charge of the study concluded that there was significant evidence that PCI' use is a cause of brain cancer. That study found a statistically significant increase in the incidence of a rare kind of tumor in the periphery of the brain where the radiation has the greatest access, i.e., the plume. (This is same location and type of tumor as Mr. Agro's tumor).

### Defendants' Conspiracy to Persuade, Intimidate and Alter Adverse Health Effect Findings

48.     For fear that the findings of adverse health effects by use of cell phones might damage market development, the Defendants' conspired to alter the results of studies to make them more "market friendly," and acted to conceal and suppress information from the public. Researchers who discovered adverse effects associated with cell phone use, lost their funding, were fired, found their reputation damaged, and had their work denigrated. Motorola researchers concealed from the public the enhancement effects of antennas and the efficiency with which antennas deposit energy into brain tissue.

49.     Almost all of the research funding concerning RF radiation comes from the wireless industry. In instances where there have been adverse findings, the Defendants have worked to prevent funding to replicate that study. This is part of Defendants' larger effort to "create and control the science" and introduce confounders in the way of researchers. Defendants' tactics and conduct included, but were not limited to, the following:

(a)     In or about late 1993/early 1994, the cell phone industry, including the named Defendants, through CTIA, organized a committee which was to draft a manual to discuss "responsible" cell phone use. After receiving a draft of the manual, Thomas Wheeler, president of CTIA, sent out a memorandum expressing his concerns over certain language used in the manual which acknowledged and/or implied that the use of cell phones could pose health risks. An example of such substantive changes follows, with the suggested deletions put forth in bold typeface:

> Do not operate your transportable cellular telephone when holding the antenna, or when any person is within 4 inches (10 centimeters) of the antenna. **Otherwise you may impair call quality, may cause your phone to operate at a higher power level than is necessary, and may expose that person to RF energy in excess of the levels established by the updated ANSI Standard.**
>
> **If you want to limit RF exposure even further, you may choose to control the duration of your calls or maintain a distances from the antenna of more than 4 inches (10 centimeters).**
>
> "For best call quality, keep the antenna free from obstructions and point it straight up."

(b)     Gandhi, a researcher for Motorola, published findings of his research that were contradictory to Kuster's. Gandhi reported that the maximum SAR's within the human brain would be about 30 times lower than what Kuster had reported. But by March of 1994, the word in the research community had spread that the Gandhi team had in fact, misstated SAR figures. During the

1991 Bioelectromagnetic Society 16th Annual Conference, Gandhi produced findings of still higher

maximum SAR's for the same research. During his presentation, SAR's corresponded, at times, to

levels as much as ten times higher than were previously reported. The conference results, presented

in Copenhagen, Denmark, never reached the U.S. audience. In a letter to the FCC, August 1994,

Gandhi explained the nature of the errors and revised his experimental results upward. That is, nearly

a full year after the initial false claims of safety and almost six months after his revisions first

became known, the Gandhi team provided an official correction.

        (c)     The Defendants acted in a fraudulent, deceitful, intimidating, illegal, and

harassing manner to a researcher by the name of Dr. Jerry L. Phillips, who essentially replicated the

DNA damage studies of Lai and Singh and reached the same conclusions, i.e., exposure to low levels

of RF radiation causes DNA damage which can develop into cancer.

        (d)     Motorola willfully and wantonly attempted to suppress information from

Plaintiffs, its other customers, the public, and government regulatory agencies by making illegal

threats and illegal acts of intimidation upon Dr. Phillips.

        (e)     After completion of his research, Dr. Phillips expressed his desire to publish

such research.  Initially, Motorola told Dr. Phillips that it was too early to publish his results and that

he needed to do more research. When Dr. Phillips refused to "spin" his research, as demanded by

Motorola, Motorola cut off Dr. Phillips' funding. Additionally, Motorola threatened to discredit Dr.

Phillips in the scientific community, as well as to ruin his career.

        (f)     After leading the cellular industry's research effort regarding the health

hazards associated with cell phone use for a period of six years, Dr. George Carlo indicated that cell

phones may very well pose health risks to its user. In a response similar to that received by Dr.

Phillips, the cell phone industry cut off Dr. Carlo's funding, attempted to discredit him within the scientific community, and attempted to ruin his career. Defendants willfully and wantonly attempted to suppress Dr. Carlo's findings by illegal threats and illegal acts of intimation made upon Dr. Carlo, a notable public health scientist, epidemiologist, lawyer, founder of Health Risk Management Group, and the individual appointed by the cell phone industry to study the health hazards associated with cell phone use.

## Defendants' Efforts to Finesse and Manipulate Independent and Governmental Agencies

50.    Defendants simply introduced cell phones into the market without any prior oversight from any governmental agency and without testing for environmental or adverse health consequences from electric fields, magnetic fields and electromagnetic melds generated by this equipment. Once done, the Defendants set about to co-op the federal agencies which had the jurisdiction to force the industry to prove the safety of cell phones. Some examples of Defendants' conduct include, but are not limited to, the following:

(a)    On July 19, 1993, Elizabeth Jacobson, Deputy Director for Science at the Center for Devices and Radiological Health, Food and Drug Administration, sent a correspondence to CTIA president Thomas Wheeler, which clearly identified certain fraudulent and deceitful statements made by the Defendants to the public regarding the "safety" of cell phones. In pertinent part, this letter states:

I am writing to let you know that we were concerned about two important aspects of your press conference on July 16 concerning the safety of cellular phones, and to ask that you carefully consider the following comments when you make future statements to the press.

First, both the written press statements and your verbal comments during the conference seemed to display an unwanted confidence that these products will be found to be absolutely safe. In fact, the

35

> unremittingly upbeat tone of the press packet strongly implies that
> there can be no hazard, leading the reader to wonder why any further
> research would be needed at all. (Some readers might also wonder
> how impartial the research can be when its stated goal is "a
> determination to reassure consumers." And when the research
> sponsors predict in advance that "we expect the new research to teach
> the same conclusions, that the cellular phones are safe.").....
>
> We are even more concerned that your press statements did not
> accurately characterize the relationship between CTIA and the FDA
> ... Since it is not yet clear whether we will help to direct, the
> research program, it is premature to state that we will credential the
> research.

The FDA has recently announced that it has been unable to test cell phones to see if they pose risk of harm from RF radiation for the past two decades.

(b)      ANSI is a private, non-profit organization made up of businesses, professional societies and trade associates, governmental agencies and standards developers. A primary goal of ANSI is the enhancement of global competitiveness of Business in the United States by promoting voluntary consensus standards. Plaintiffs are informed and believe and thereon allege that the Defendants are members of ANSI. IEEE is a non-profit, technical professional association of electrical and radio engineers, Plaintiffs are informed and believe and thereon allege that many of Defendants' officers and employees are members of the IEEE.

(c)      ANSI adopted a set of RF radiation thermal exposure levels that determined to be safe for humans. The ANSI standard was initially developed during the 1960's, modified during the early 1980's, and modified again during the early 1990's. In its initial form, during the 1960's the IEEE/ANSI safety standard, known as ANSIC95.I, established a maximum safe exposure level for RF radiation at 10.0m W/cm2. The modified standard, ANSCI95. 1-1982 set the maximum level for radio radiation exposure on a sliding scale by dividing the frequency by a multiple of three hundred.

36

At 845 MHz, the safety standard would be 2.8m W/cm2; at 1900 MHz the safety standard would be 6.33m W/cm2. In 1985, the FCC adopted the 1982 ANSI standard but excluded cell phones based on data that they would not cause exposures in excess of the guidelines under normal and routine conditions of use. Cell phones, which were introduced in 1986, could not meet the standard established in 1982.

      (d)    The cell phone industry manipulated the research and pressured members of the ANSI Safety Standard Committee to exempt cell phones from regulation and compliance under the ANSI standards. During a 1989 meeting of the ANSI Committee, held in Tucson, Arizona, the cell phone industry representatives dominated the membership of the standard setting committee. After a heated discussion and debate over the exclusion clause it was decided upon a vote by the committee that cell phones would not be excluded from regulation or compliance under the ANSI Safety Standard. A short time after the meeting, at another quietly held committee meeting attended by a select, smaller group of members, the exclusion clause passed, and as a result, cell phones would be excluded from any testing, compliance, or monitoring by any safety standard, government agency, or regulatory body.

      (e)    In 1992, the ANSI standard was revised to include, for the first time, specific restrictions on time currents induced in the human body by RF radiation fields. Cell phones were again excluded  provided that they comply with certain specific absorption rate ("SAR") limits. On August 1, 1996, the FCC adopted the 1992 ANSI guidelines.

### Defendants' Failure to Reasonably Test Cell Phones

      51.    The Defendants have an obligation to conduct a reasonable amount of testing of cell phones for safety before releasing the product for sale to the public. The Defendants' researchers

found that the measured radiation levels from cell phones exceeded ANSI guidelines and should be considered dangerous. At this point, Defendants determined that "lack of knowledge" was preferable to more extensive and revealing testing and they decided to go forward with the production, sale and distribution of cell phones without pursuing design changes that would eliminate the risk of harm to the cell phone user.

52.     After the FCC established a maximum SAR, standard on August 1,1996 it allowed cell phone manufacturers to self certify their cell phones as within the SAR limits. SAR testing is performed on a biological model (called a "phantom") using a cell phone antenna placed nearby which is sending electromagnetic radiation. Measurements are then made of the magnetic fields which are reflected from and absorbed by the phantom.

53.     SAR results can be easily manipulated by changing the distance between the antenna and the phantom. For example, when the distance becomes smaller than 3 cm, the reflected signal increases to more than 25% and the probe receiving the magnetic fields for the calculation of the antenna currents results in being measured smaller than the actual value, which leads to a large SAR error.

54.     The medium used in the phantom either is semi-liquid or gel material. Over time this medium develops air pockets and becomes contaminated. Such air pockets and contamination serve to reduce the magnetic field reaching the probe and the result is a smaller than actual value and an SAR error.

55.     The medium is intended to represent a composite of the cell structures of the skirt, fat, bone, cerebro-spinal fluid, dura, etc. However, each of these tissues absorbs and reflects RF radiation differently. Furthermore, the non-uniform nature of the head directs and concentrates RF

38

radiation into small areas rather than being distributed uniformly throughout. Defendants are aware that the medium does not accurately reflect the structure of the human head and that an accurate model would show levels of concentrated energy in the brain which are greater than ten times the overall average shown by using time medium.

56.     The Plaintiffs are informed and believe and allege that Defendants are well aware of the above problems concerning SAR testing and that they have used these variables to report SAR values which are below actual values and that such actual values exceed the SAR limits established by the FCC. On July 13, 2001, a representative of the Defendants told the Federal District court in Baltimore that "SAR is not backed by any scientific study. It's just a number."

### Defendants Have Had the Ability
### To Reduce or Eliminate the Health Risk

57.     At all times herein mentioned, Defendants were aware of numerous solutions that could virtually eliminate the health hazards of radiation from cell phones such as shielding, antenna phasing, use of low reluctance material pattern, shrouds, canting, etc. Plaintiffs are informed and believe that Defendants could have incorporated one or more of these safety features in cell phones at a minimal cost but instead engaged in a cost benefit analysis balancing human lives and health against corporate profits. Defendants' prior knowledge of these solutions included, but was not limited to, the following:

(a)     On October 24, 1991, Hitachi received a patent to reduce the cell phone user's exposure to RF radiation "to prevent the health of the user from being injured."

(b)     On August 11, 1992, Mitsubishi was issued a patent for a cordless telephone designed to "reduce the effect of an electromagnetic wave into a head of a human body" by coating the handset with shielding material on the side closest to the user's head.

39

(c)     On December 26, 1995, Motorola filed a patent wherein "a high magnetic permeability/low reluctance material is incorporated into an antenna to limit radiation, where radiation is not desired."

(d)     On February 20, 1996, Alcatel N.V. was granted a patent "for protecting a portion of the human body of a user of the transmitter against the radiation from said internal radiating system."

(e)     On April 9, 1996, a patent was issued to Kevin and Norval Luxon for shield apparatus which utilizes electromagnetic radiation absorbing materials "disposed about the antenna and portable wireless transmitting apparatus and between the user and the antenna and transmitting apparatus to shield or protect the user from the potentially harmful radiation emissions from the wireless communication apparatus." The Motorola patent referred to  above lists the Luxon patent as prior art. Plaintiffs are informed and believe and thereon allege that the Luxon invention had been presented to Motorola and discussed with its engineers prior to the grant and publication of that patent.

(f)     On June 4,1996, Ericsson received a patent for an output power controller to assure " that the average RF-exposure levels from...cellular hand-held radio telephones do not exceed a predetermined level."

(g)     On August 13, 1996, Catholic University received a patent for the "protection of living systems from adverse effects of electric, magnetic and electromagnetic fields." The application for the patent states "extensive experimental evidence has shown that exposure to ELF electromagnetic fields can lead to changes in biological cell function.  Similar effects have been demonstrated from exposure to modulated microwaves and RF signals.  Since ALL (cell phones)

transmit modulated microwave or RF signals the potential induction of bio-effects through the use of these devices is evident."

      (h)    On September 23, 1997, Motorola filed a patent for an antenna with an absorption electromagnetic shield which results in "little to no radiation directed towards the body of the user."

      (i)    On September 25, 1997, Motorola submitted a patent application wherein "a high magnetic permeability/low reluctance material is incorporated into an antenna to limit radiation, where radiation is not desired.."

      (j)  On July 28, 1998, Nokia received a patent for a shielding layer between the antenna and the user to reduce the electromagnetic irradiation of the user. The application says the cell phone antenna is a "few centimeters from the brain, the hearing organs, and the organ of equilibrium. Although a direct heating effect could be left without further consideration, it has been suggested that modulated RF radiation induces changes in the electrical status, i.e., in the ion balance of nerve cells. A continuous localized exposure to radio frequency irradiation has been suggested to weaken myelin sheets of cells and to eventually lead to an impairment of hearing capability, vertigo, etc. It has been suggested that radio frequency irradiation may stimulate extra growth among supportive cells in the nerve system, which in the worst case it has been suggested could [lead] to a development of malignant tumor, e.g. giloma form supportive cells."

      (k)    On December 29, 1998, Nokia received a patent for an accessory RF unit which "decreases radiation directed towards the user's head."

      (l)    On November 16, 1999, Ericsson received a patent for an antenna switch to prevent cell phones from being used unless the antenna is fully extended. The patent application

states that if the antenna is not fully extended "the antenna will be in undesirably close proximity to the user's head, thereby increasing the user's specific absorption rate (SAR) of electromagnetic energy emitted from the antenna."

(m)     On January 25, 2000, Nokia received a patent for a cell phone alarm system so that the user may "reduce to a minimum the SAR value and the quantity of radiation directed at his head or body by employing the correct appliance position and situations and by adjusting the transmission time."

(n)     On February 29, 2000, Centurion International received a patent for an antenna to "tailor the radiation characteristics of the antenna in such a way as to decrease the specific absorption rates (SAR) to the user of the" cell phone. The patent application states "questions have arisen concerning the possibility of harmful effects of electromagnetic energy on the human body in as much as handheld radios, cell phones and other portable wireless communication devices do emit electromagnetic energy.  Many studies have been conducted to closely examine the effects of electromagnetic energy on the human body to determine a safe level of exposure and how to accurately measure the level. In conjunction with this, there have been some attempts to move the source of electromagnetic energy away from the body by means of the antenna location or design. For example, see [references]."

58.     At all times herein mentioned, intellectual property claims were closely monitored by Defendants and were well aware of the above-listed patents, and others, that recognized the adverse health effects from use of cell phones.

42

**Defendant's Misrepresentation and Failure to Disclose**

59.    At all times relevant, Defendants, themselves, or by use of others, did manufacture, create, design, test, label, package, distribute, supply, market, sell, advertise, and/or otherwise distribute products and services related to cell phones in the District of Columbia, and elsewhere in the United States, including the State of New Jersey, to cell phone owners and users throughout its service areas, nationally and internationally.

60.    Defendants' strategy has been to aggressively market and sell cell phones and related service by misleading and misinforming potential users about the products and by failing to protect users from serious dangers, which Defendants knew or should have known directly to result from the use of these products.

61.    Defendants widely and successfully marketed cell phones across the United States, including the District of Columbia and the State of New Jersey.  Defendants undertook an advertising blitz extolling the virtues of cell phones in order to induce widespread use of the product. The Defendants' marketing campaign consisted of advertisements on television, radio and the Internet, promotional literature to be placed in the printed media and in other advertising media, and other promotional materials to be provided to potential users of cell phones.

62.    The Defendants' advertising program, as a whole, through affirmative misrepresentations and omissions, falsely and fraudulently sought to create the image and impression that the use of cell phones was safe with no potential for biological harm to the user.

63.    Defendants purposefully downplayed, understated, and/or did not state the health hazards and risks associated with cell phones. Defendants, through promotional literature, deceived potential users of cell phones by relaying positive information, including testimonials from satisfied

users, and by manipulating statistics to suggest widespread acceptability, while downplaying, understating, and/or not stating the known adverse and serious health effects. Defendants intentionally and falsely kept relevant information from potential and actual cell phone users and minimized user concern regarding the safety of these products and services in an effort to deceive such potential and actual users.

64.    CTIA has been in the forefront of the cell phone industry's bad faith and deceptive public relations program to reassure the public of the absence of risk of harm from cell phone use. A standard press release by CTIA states that "after years of substantial research, scientists and governments around the world continue to reaffirm that there is no public health threat from the use of wireless phones." A Motorola executive announced to the news media that "thousands of studies" had already shown cell phones were safe. These statements were false and misleading and made in willful and wanton disregard of the true facts known to Defendants and the right of the Plaintiffs to be aware of the risks associated with the use of cell phones.

65.    The Defendants have and continue to manipulate the science to the detriment of consumers by failing to reveal all relevant findings and by selectively withholding important public health information from the public and Plaintiffs in an effort to mislead and deceive them in bad faith.

66.    The Defendants have intentionally concealed and withheld material information from Plaintiffs as well as other potential and actual cell phone users, including, but not limited to, the following:

(a)    The ANSI standards for RF radiation had consistently been revised downward.

(b)    The 1992 ANSI guidelines required cell phones to operate below certain SAR limits or that the cell phones Mr. Agro had purchased had not been certified to be in compliance with the ANSI guidelines or the FCC mandated SAR limits.

(c)    The model cell phones purchased and used by Mr. Agro had a test SAR reading above the level set by the 1992 ANSI guidelines.

(d)    The cell phones sold to Mr. Agro are equipped with a retractable whip antenna. During the SAR testing, such antennas are fully extended. If the antenna is not extended to its full length, the radiation point will be in an undesirably close proximity to the user's head and there will be an increase of the SAR of electromagnetic energy emitted from the antenna. Although it is possible to disable the antenna unless it is fully extended, this was not done in the cell phone purchased by Mr. Agro. The Defendants did not disclose to Plaintiffs or other potential and actual cell phone users that the cell phone antenna should be extended when the device is in use.

(e)    That "hot spots" within the brain are created by the reflection and refraction of the RF radiation waves off such things as the curvature of the skull, ridges in the bone and the irregular shape of the brain, which focus the energy much as a magnifying glass does on a single location and creates a SAR reading 200 times the allowable amount.

(f)    That the SAR testing conducted by Defendants does not test for non-ionizing radiation or for "hot spots" created by the convergence of airwaves by reason of reflection and refraction off of the irregular surfaces of the human head and attenuation by passage through different layers of skin, fat, bone, etc. before reaching the brain.

(g)    That when the cell phone is held at different positions against the head, it results in greatly different SAR results. The Defendants did not provide Mr. Agro, or any other

45

potential or actual cell phone users, with any instruction showing how Mr. Agro's cell phone should

be positioned relative to his head or warning concerning the consequences of not maintaining the

distance and angle of the antenna in conformance with the SAR test procedures.

(h)    That there is a wide range of individual tolerance to RF radiation as a result

of differences in individuals' body cell water, fat content and other factors. This makes certain

individuals more susceptible to the effects of such radiation.

67.    All of the Defendants' conduct was willful, wanton and Defendants acted with

reckless and conscious disregard for the consequences of their actions.

68.    As a result, each and all of the Defendants are liable for punitive and exemplary

damages in such amounts as a jury deems just and proper under the circumstances.

### Mr. Agro's Reliance on the Defendants' Representations

69.    Mr. Agro is a businessman from Howell, New Jersey.  He used his cell phone on

Defendants' cellular systems on a more or less continuous basis in the course of his daily affairs,

both business and personal.  Defendants were aware of the large number of minutes of airtime for

long periods used by Mr. Agro.  None of the Defendants ever told Mr. Agro that there was a risk of

harm associated with his cell phone use, or that he use a headset or take other precautionary

measures to reduce his radiation exposure from cell phones.

70.    Mr. Agro relied on the Defendants' statements that cell phones were safe to use in

making his decision to purchase cell phones and subscribe to Defendants' cellular service, and only

recently became aware that his use of cell phones caused his severe injuries and adverse health

effects. Mr. Agro would never have purchased a cell phone or taken the risk of using a cell phone

had he been aware of the studies which show that RF radiation is an initiator or promoter of brain tumors and/or cancer.

71.    Mr. Agro was entitled to be fully informed concerning the myriad of other scientific studies, clinical observations, and hypotheses by noted scientists and engineers before he consented to unknowingly exposing himself to the risk of harm from his use of cell phones. Had the information set forth above been disclosed to Mr. Agro, he would have ceased using his cell phone.

## FIRST CAUSE OF ACTION

### (Intentional Fraud and Misrepresentation)

72.    Mr. Agro hereby incorporates by reference and realleges paragraphs 1 through 71 of this Complaint as if fully restated herein.

73.    Plaintiff, Mr. Agro, justifiably relied on the false representations made by the Defendants, was defrauded by Defendants' concealment and failure to conduct proper research, and as a direct result suffered damages.

74.    As a direct, contributory and proximate result of the Defendants' fraudulent conduct, Plaintiff, Mr. Agro has suffered permanent disability, has undergone surgery and has undergone cancer treatments. Furthermore, Plaintiff, Mr. Agro, sustained economic loss, emotional and psychological stress, including loss of earnings and diminution or loss of earning capacity. Plaintiff, Mr. Agro, requires reasonable and necessary health care, attention and services and has incurred and will incur medical, health, incidental and related expenses, and/or has been otherwise injured.

75.    Defendants conspired and acted in concert to deceive and fraudulently induce Mr. Agro and other consumers to purchase, use and continue to use cell phones.

47

76.     In furtherance of the scheme to defraud, Defendants made false, malicious and willful misrepresentations to Mr. Agro and other consumers and/or intentionally concealed and hid material facts from Mr. Agro and other consumers in an effort to deceive and defraud them.

77.     At all times herein, Defendants and each of them, in their advertising, public statements, instruction manuals and Mr. Agro's promotional literature, continuously made false representations to lead the public and Mr. Agro to believe that the cell phones are safe and do not pose any risk of harm to the user whatsoever.

78.     In order to maintain and/or increase their sales and profits, Defendants, and each of them, through their advertising, promotional campaigns and marketing, have, by the use of false statements and/or material omissions of fact, intentionally misrepresented the following to the public, including Mr. Agro:

(a)     Cell phones are safe to use and that there is absolutely no health risk from cell phones;

(b)     Health care standards have been adopted by the Federal Government to assure the public that cell phones are safe;

(c)     Research has shown that there is absolutely no risk of harm associated with the use of cell phones;

(d)     Manufacturers testing of cell phones is a guarantee that the cell phones emit no harmful radiation; and

(e)     All precautions and safety measures have been used to ensure the safety of cell phones.

48

79.    In order to maintain and/or increase their sales and profits, Defendants, and each of them, through their advertising, promotional campaigns and marketing, have intentionally, maliciously and knowingly concealed and hid material facts from the public, including Mr. Agro, as follows:

(a)    concealed evidence that would have demonstrated to the public, including Mr. Agro, that there is a risk of harm from cell phone use;

(b)    failed to adequately test cell phones and failed to inform the public that such cell phones did not meet safety standards amid that such standards had been changed;

(c)    falsely stated to the public, including Mr. Agro, through advertising and testimonials that cell phones are completely safe;

(d)    failed to warn the public, including Mr. Agro, of research that indicated an association between cell phone radiation fields and illness, including brain tumors and/or cancer;

(e)    failed to incorporate methods and solutions in cell phones which would eliminate the transmission of RF radiation into the user's body and concealing the development of such solutions from the public, including Mr. Agro;

(f)    failed to provide protective devices with the cell phone which would reduce the risk of harm to the user.

(g)    failed to properly instruct users concerning the use of cell phones,

(h)    failed to disclose the nature of research results; and,

(i)    falsely stated that Federal governmental agencies had found cell phones did not present a risk of harm to the user.

49

80.     Defendants made the misrepresentations and omission of material fact with full knowledge of the falsity thereof and/or with reckless disregard for the truth.

81.     Defendants intentionally made the misrepresentations and omissions in bad faith.

82.     In making these misrepresentations of fact to Mr. Agro, as well as other prospective and current users of cell phones, while knowing such representations to be false, Defendants have intentionally misrepresented material facts and breached their duty not to do so. Had Mr. Agro been aware of the true facts concerning the health risks associated with cell phone use, he would not have purchased a cell phone or subscribed to Defendants' cellular service.

83.     Defendants made the misrepresentations and concealed and hid material facts from Mr. Agro for the purpose of causing Mr. Agro, as well as other prospective and current users of cell phones, to rely upon such statements and omissions to their detriment, which in fact occurred.

84.     Mr. Agro reasonably relied upon these misrepresentations and has suffered financial loss in business and illness and injury as result of exposure to harmful RF radiation from cell phone usage. Mr. Agro may have also suffered additional adverse health effects from the use of his cell phone which have not yet been discovered because of the latency period before such injuries and illness manifest themselves.

85.     By virtue of the intentional, malicious and bad faith conduct of Defendants, Mr. Agro is entitled to recover punitive and/or exemplary damages.

86.     As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Agro has suffered damages which he is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, punitive and/or exemplary damages, interest, costs and attorney fees.

WHEREFORE, Plaintiff, Mr. Agro, respectfully requests that judgment be entered against Defendants, jointly and severally, as follows:

A.   Compensatory damages in an amount in excess of $25,000,000;

B.   Consequential damages in an amount in excess of $25,000,000;

C.   Punitive and/or exemplary damages in an amount in excess of $100,000,000;

D.   Interest, costs and attorney fees; and

E.   Such other and further relief as is warranted and appropriate.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation)

87.   Mr. Agro hereby incorporates by reference and realleges paragraphs 1 through 86 of this Complaint as if fully restated herein.

88.   Defendants expressly and/or impliedly undertook to exercise, and owed Mr. Agro the duty to exercise, ordinary and reasonable care when making representations as to the safety and usage of cell phones.

89.   In making misrepresentations of fact to the public, including Mr. Agro, Defendants failed to fulfill their duty to disclose all the material facts in a true and correct manner. As set forth in the General Allegations, Defendants made false and inaccurate representations concerning the safety and usage of cell phones and concealed and failed to disclose material facts with respect thereto to the public, including Mr. Agro.

90.   Mr. Agro was unaware of the Defendants' affirmative misrepresentations and failure to disclose the fact that there was a risk of great harm associated with the use of cell phones. Mr.

51

Agro reasonably relied on Defendants' representations concerning the safety of cell phones to his detriment.

91.    By virtue of the intentional, malicious and bad faith conduct of Defendants, Mr. Agro is entitled to recover punitive and/or exemplary damages.

92.    As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Agro has suffered damages which he is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, punitive and/or exemplary damages, interest, costs and attorney fees.

WHEREFORE, Plaintiff, Mr. Agro, respectfully requests that judgment be entered against Defendants, jointly and severally, as follows:

A.    Compensatory damages in an amount in excess of $25,000,000;

B.    Consequential damages in an amount in excess of $25,000,000;

C.    Punitive and/or exemplary damages in an amount in excess of $100,000,000;

D.    Interest, costs and attorney fees; and

E.    Such other and further relief as is warranted and appropriate.

## THIRD CAUSE ACTION

### (Strict Product Liability)

93.    Mr. Agro hereby incorporates by reference and realleges paragraphs 1 through 92 of this Complaint as if fully restated herein.

94.    Defendants are manufacturers and/or suppliers of cell phones and cellular services and are engaged in the design, manufacture, and sale of cell phones.

95.    Mr. Agro purchased such goods and services from Defendants, without knowledge that the same were defective and dangerous. Had Mr. Agro been aware of the risk of biological damage arising out of the use of cell phones he would not have purchased a cell phone or subscribed to Defendants' cellular service.

96.    At all times relevant hereto, Mr. Agro used Defendants' goods and services in the manner for which they were intended.

97.    Mr. Agro was injured as a result of the defective condition of Defendants' goods and services, said defect having existed at the time of manufacture of the products and continuing to exist. through and including the time of injury. Therefore, Defendants are strictly liable to Mr. Agro for the injuries sustained by Mr. Agro and the damages he had incurred thereby.

98.    By virtue of the intentional, malicious and bad faith conduct of Defendants, Mr. Agro is entitled to recover punitive and/or exemplary damages.

99.    As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Agro has suffered damages which he is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, punitive and/or exemplary damages, interest, costs and attorney fees.

WHEREFORE, Plaintiff, Mr. Agro, respectfully requests that judgment be entered against Defendants, jointly and severally, as follows:

A.    Compensatory damages in an amount in excess of $25,000,000;

B.    Consequential damages in an amount in excess of $25,000,000;

C.    Punitive and/or exemplary damages in an amount in excess of $100,000,000;

D.    Interest, costs and attorney fees; and

E.    Such other and further relief as is warranted and appropriate.

## FOURTH CAUSE OF ACTION

### (Failure to Warn and Defective Manufacture and Design)

100.    Mr. Agro hereby incorporates by reference and realleges paragraphs 1 through 99 of this Complaint as if fully restated herein.

101.    At all times herein relevant, Defendants were the researchers, designers, manufacturers, suppliers and sellers of cell phones, which were placed in the stream of commerce in a defective and unreasonably dangerous condition. Despite the known risk of harm to consumers, Defendants failed to equip their cell phones with safeguards and protection against the RF radiation, which safeguards were available, and Defendants failed to provide protective devices such as, but not limited to, a headset or speaker phone adapter which should have been furnished as a part of the cell phone.

102.    The cell phones were defective in that they were marketed and sold without adequate testing and/or with knowledge that the test information was unreliable, inadequate or in error.

103.    Defendants failed to provide and include proper and necessary warnings regarding the potential adverse health effects associated with the use of cell phones that they knew, or should have known, posed the risk of injury to Mr. Agro.  Moreover, despite such knowledge, Defendants failed to properly instruct Mr. Agro concerning the use of cell phones so as to minimize the risk. Instead, Defendants continued to promote the cell phones as totally safe, free of defects and free from risk of harm.

104.    As a direct, natural, proximate and foreseeable result of the defective and unreasonably dangerous conditions of the cell phones and due to the Defendants' failure to protect,

instruct or warn Mr. Agro, he has developed cancer in his brain, has undergone surgery, radiation and chemotherapy, suffers from numerous impairments and disabilities, along with severe emotional distress and anxiety and has been financially damaged. Although he has continued light supervision of his business, Mr. Agro can no longer work full-time, and suffers from excessive fatigue, debility, visual impairment, severe headaches, heightened sensitivity to noise, memory problems, psychological and emotional stress, brain cancer and trauma associated with brain surgery, cancer and a brain tumor and is otherwise injured.

105. By virtue of the intentional, malicious and bad faith conduct of Defendants, Mr. Agro is entitled to recover punitive and/or exemplary damages.

106. As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Agro has suffered damages which he is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, punitive and/or exemplary damages, interest, costs and attorney fees.

WHEREFORE, Plaintiff, Mr. Agro, respectfully requests that judgment be entered against Defendants, jointly and severally, as follows:

A. Compensatory damages in an amount in excess of $25,000,000;

B. Consequential damages in an amount in excess of $25,000,000;

C. Punitive and/or exemplary damages in an amount in excess of $100,000,000;

D. Interest, costs and attorney fees; and

E. Such other and further relief as is warranted and appropriate.

## FIFTH CAUSE OF ACTION

### (Negligence)

107.    Mr. Agro hereby incorporates by reference and realleges paragraphs 1 through 106 of this Complaint as if fully restated herein.

108.    Defendants owed Mr. Agro the duty of ordinary and appropriate care in the testing, manufacture, quality assurance, quality control, distribution, advertising, sale, provision of operating instructions and provision of the cell phones. Defendants failed to fulfill that duty in numerous respects including, but not limited to, the following:

(a)    Not adequately or properly testing cell phones for health hazards associated with exposure to radiation fields emitted by cell;

(b)    By failing to disclose the health risks from cell phones radiation fields which was already known at the time of marketing the product;

(c)    By marketing, promoting and selling cell phones which emit harmful radiation fields without adequate safeguards to protect the user;

(d)    By failing to provide adequate warning to the public, purchasers or users of cell phones regarding the dangerous potential hazardous radiation fields emitted by the cell phones; and

(e)    By failing to provide adequate instruction to the user concerning the proper operation of cell phones.

109.    By virtue of the intentional, malicious and bad faith conduct of Defendants, Mr. Agro is entitled to recover punitive and/or exemplary damages.

110.    As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Agro has suffered damages which he is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, punitive and/or exemplary damages, interest, costs and attorney fees.

WHEREFORE, Plaintiff, Mr. Agro, respectfully requests that judgment be entered against Defendants, jointly and severally, as follows:

A.    Compensatory damages in an amount in excess of $25,000,000;

B.    Consequential damages in an amount in excess of $25,000,000;

C.    Punitive and/or exemplary damages in an amount in excess of $100,000,000;

D.    Interest, costs and attorney fees; and

E.    Such other and further relief as is warranted and appropriate.

## SIXTH CAUSE OF ACTION

### (Breach of Express Warranty)

111.    Mr. Agro hereby incorporates by reference and realleges paragraphs 1 through 110 of this Complaint as if fully restated herein.

112.    Defendants expressly warranted, orally and in writing, that cell phones were safe for human usage.

113.    Defendants' warranties constitute affirmations of fact, promises and descriptions regarding the quality and safety of their products and services.

114.    Defendants breached these warranties in that they failed to eliminate or minimize health hazards from the radiation fields by failure to incorporate safeguards in cell phones and failure

57

to provide protective equipment and by inadequately training users as to the appropriate method of using a cell phone.

115.    The cell phones sold to and used by Mr. Agro do not conform to Defendants' express representations because they are not safe and have high potential for causing serious biological and health effects, including life threatening diseases.

116.    By virtue of the intentional, malicious and bad faith conduct of Defendants, Mr. Agro is entitled to recover punitive and/or exemplary damages.

117.    As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Agro has suffered damages which he is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, punitive and/or exemplary damages, interest, costs and attorney fees.

WHEREFORE, Plaintiff, Mr. Agro, respectfully requests that judgment be entered against Defendants, jointly and severally, as follows:

A.    Compensatory damages in an amount in excess of $25,000,000;

B.    Consequential damages in an amount in excess of $25,000,000;

C.    Punitive and/or exemplary damages in an amount in excess of $100,000,000;

D.    Interest, costs and attorney fees; and

E.    Such other and further relief as is warranted and appropriate.

## SEVENTH CAUSE OF ACTION

### (Breach of Implied Warranty)

118.    Mr. Agro hereby incorporates by reference and realleges paragraph 1 through 117 of this Complaint as if fully restated herein.

119.    At the time Defendants marketed, sold, distributed and/or promoted cell phones and cellular services for use by Mr. Agro, Defendants knew of the use for which cell phones were intended and impliedly warranted the product and services to be of merchantable quality and safe and fit for such use.

120.    Plaintiffs relied upon the skill and judgment of Defendants as to whether the cell phones were of merchantable quality and safe and fit for their intended us.

121.    Mr. Agro used the cell phones with the cellular service as intended and foreseen by Defendants.

122.    Defendants breached said warranties as such cell phones were not fit for their intended purpose and are unreasonably dangerous and unfit for that purpose.

123.    As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Agro has suffered damages which he is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, punitive and/or exemplary damages, interest, costs and attorney fees.

WHEREFORE, Plaintiff, Mr. Agro, respectfully requests that judgment be entered against Defendants, jointly and severally, as follows:

A.    Compensatory damages in an amount in excess of $25,000,000;

B.    Consequential damages in an amount in excess of $25,000,000;

C.    Punitive and/or exemplary damages in an amount in excess of $100,000,000;

D.    Interest, costs and attorney fees; and

E.    Such other and further relief as is warranted and appropriate.

## EIGHTH CAUSE OF ACTION

### (Conspiracy)

124.    Mr. Agro hereby incorporates by reference and realleges paragraphs 1 through 123 of this Complaint as if fully restated herein.

125.    At all times relevant hereto, the Defendants, formed confederacies entered into agreements and/or tacit understandings to individually, jointly, and in conspiracy with each other, market unreasonably dangerous and defective cell phones by collective means, including their collective conduct of suppressing their knowledge of the health hazards from exposure to radiation fields from cell phones, and of placing into the stream of commerce dangerously defective cell phones without first proving that such cell phones were safe for public use, with an intent to defraud the public, including Mr. Agro.

126.    The Defendants, acting collectively, reached a common agreement or understanding to market their defective cell phones by:

(a)    marketing, producing and promoting the use of cell phones without proper tests or warnings and without regard to the dangerous radiation fields emitted therefrom and without disclosing the effects that the radiation fields might cause to Mr. Agro and other users;

(b)    suppressing, discouraging and/or retarding appropriate research, testing, regulation and public dissemination of information concerning the radiation fields and the effects those emissions would have on Mr. Agro;

(c)    ignoring, deceiving or misleading the public about medical and scientific data available to them which clearly indicated that RF radiation emitted from cell phones is potentially hazardous to the health and safety of the public and Mr. Agro; and

(d)    suppressing and preventing the development of safety features which would reduce or eliminate the risk of RF radiation to the cell phone user for reason of cost and potential liability and for not having deployed such features at the outset of cell phone production.

127.    Defendants, jointly and in conspiracy with each other, knowingly committed the acts described herein, as well as other similar acts, in furtherance of their agreement or understanding to promote and market cell phones.

128.    Defendants were aware of the dangers to those exposed to RF radiation from cell phones prior to the use of such equipment by Mr. Agro.

129.    At all times relevant hereto, notwithstanding their knowledge of the hazards of said radiation field emissions from cell phones, Defendants collectively lobbied, pressured, deceived and mislead various government officials and standard setting bodies to prevent regulation and control of cell phones.

130.    At all times relevant hereto, Defendants collectively spent millions of dollars per year to finance selective research designed to confuse and cast doubt on the growing evidence that radiation cell phones are hazardous to users.

131.    Notwithstanding their extensive knowledge of the hazards of such RF radiation from cell phones, Defendants continued to promote and advertise cell phones as completely safe for use and plaintiffs were mislead and deceived by the Defendants into believing that cell phones could not contribute to or cause adverse health effects.

132.    Defendants, acting collectively, reached a common understanding or agreement so that to this very day, Defendants have refused to acknowledge the risk of harm from cell phone radiation fields, or take precautionary steps to eliminate or reduce the risk of harm from such

radiation fields, or instruct and warn consumers about the hazards associated with such radiation field emissions, notwithstanding their knowledge of such health hazards.

133.    Defendants' collective, conspiratorial and tortious activities were knowingly and purposefully designed for their own economic and pecuniary benefit and were performed in furtherance of Defendants' respective joint business interests.

134.    At all times relevant hereto, notwithstanding their knowledge of the hazards of the emission of radiation fields from cell phones, Defendants continued, and continue to this very day, to place into the stream of commerce dangerous and defective cell phones.

135.    By virtue of the intentional, malicious and bad faith conduct of Defendants, Mr. Agro is entitled to recover punitive and/or exemplary damages.

136.    As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Agro has suffered damages which he is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, punitive and/or exemplary damages, interest, costs and attorney fees.

WHEREFORE, Plaintiff, Mr. Agro, respectfully requests that judgment be entered against Defendants, jointly and severally, as follows:

A.    Compensatory damages in an amount in excess of $25,000,000;

B.    Consequential damages in an amount in excess of $25,000,000;

C.    Punitive and/or exemplary damages in an amount in excess of $100,000,000;

D.    Interest, costs and attorney fees; and

E.    Such other and further relief as is warranted and appropriate.

## NINTH CAUSE OF ACTION

### (Violations of the District of Columbia
### Consumer Protection Act of 2000)

137.    Mr. Agro hereby incorporate by reference and realleges paragraph 1 through 136 of this Complaint as if fully restated herein.

138.    D.C. Code §§28-3904, et seq., authorizes Mr. Agro to bring a grievance and/or cause of action to recover for injury or loss sustained as a result of improper trade practices as prohibited by the District of Columbia Consumer Protection Act of 2000 (the "Act"). Other states as well as the Federal Government have enacted substantially similar legislation to this Act and, where and when applicable, this count shall substantially conform to that state's consumer protection statute.

139.    By engaging in the conduct described above, the Defendants have violated D.C. Code §§28-3904 (a), (b), (d), (e), (f), (g), (h), (j), (k), (l), (o),( r), (s), (t),(u), (w), (x) otherwise known as the District of Columbia Consumer Protection Act of 2000, by, among other things:

(a)    engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (a) and (b) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing that the goods and/or services provided by the Defendants have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that their goods and/or services did not have.

(b)    engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (d) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing representations of goods or services that are of a particular

63

standard, quality, or grade, or that goods are of a particular style or model, if they are in fact of another standard, quality, grade, style or model.

(c)    engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (e) and (f) by making false and misleading oral and written statements and/or omissions that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro.

(d)    engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (h) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing representations of goods or services about which are in fact not the goods or services in which the Defendants' intend and/or intended to sell.

(e)    engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (j) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing representations regarding goods or services and the reasons for certain price reductions;

(f)    engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (k) and (l) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing representations regarding goods or services and the reasons replacements and/or repairs are needed to those goods and services and/or that falsely state the reasons for offering and/or supplying goods or services at sale or discount prices;

(g)      engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (o) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing representations regarding parts or components in an electrical or mechanical apparatus, appliance, chattel and/or other good or merchandise were replaced because they were defective without prior consent;

(h)      engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (o) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing representations regarding parts or components in an electrical or mechanical apparatus, appliance, chattel and/or other good or merchandise were replaced because they were defective without prior consent.

(i)      engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (r) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into making and/or requiring them to make unconscionable terms or provisions of a consumer sales contract and/or lease of a good in that they would be unable to receive substantial benefit from said agreement and/or that the aforesaid unsophisticated consumers would not understand the material terms of the agreement as stated;

(j)      engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (s) by making false and misleading oral and written

statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing representations regarding the origin of the goods and/or services;

(k)    engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (t) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing deceptive representations or designations of geographic origin in connection with goods or services;

(l)    engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (u) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing representations to the effect that the subject of the transaction has been supplied in accordance with a previous representation when in fact this has not occurred;

(m)    engaging in unfair methods of competition and unfair or deceptive acts or practices as defined in D.C. Code §§28-3904 (w) and (x) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading consumers, including Mr. Agro, into believing representations regarding conformance with applicable product safety standards and/or statutes with full knowledge that the good and/or serve does not in fact conform, and;

(n)    otherwise misleading, deceiving or damaging consumers, including Mr. Agro.

140.    To remedy these violations, it is requested that this Court award damages for the injuries and losses sustained by Mr. Agro and reasonable attorneys fees pursuant to said Act.

141.    As a consequence of these unfair and deceptive trade practices of Defendants, Mr. Agro reasonably relied on these representations and was deceived and damaged.

142.    By virtue of the intentional, malicious and bad faith conduct of Defendants, Mr. Agro is entitled to recover punitive and/or exemplary damages.

143.    As a direct, natural, proximate and foreseeable result of the Defendants' conduct and violation of District of Columbia, Mr. Agro has suffered permanent disability, has undergone surgery on January 14, 2000, and has undergone radiation and chemotherapy.  In addition, Mr. Agro suffers excessive fatigue, debility, visual impairment, severe headaches, heightened sensitivity to noise, memory problems, psychological and emotional stress, among other injuries, all arising as debilitating effects of brain cancer and trauma associated with the brain surgery and brain tumor. Mr. Agro's condition is not expected to improve and medical care is necessary.

144.    As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Agro has suffered damages which he is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, punitive and/or exemplary damages, interest, costs and attorney fees.

145.    As a further direct, natural, proximate and foreseeable result of the Defendants' conduct and violation of District of Columbia law, Mr. Agro has been injured in health, strength and activity and suffered injuries to body and mind, the exact nature and extent of which will be determined. Mr. Agro has sustained economic loss, including loss of earnings and diminution or loss of earning capacity, Mr. Agro requires reasonable and necessary health care, attention and services, and has incurred and will incur medical, health, incidental and related expenses and/or has been otherwise injured

WHEREFORE, Plaintiff, Mr. Agro, respectfully requests that judgment be entered against Defendants, jointly and severally, as follows:

    A.    Compensatory damages in an amount in excess of $25,000,000;

    B.    Consequential damages in an amount in excess of $25,000,000;

    C.    Punitive and/or exemplary damages in an amount in excess of $100,000,000;

    D.    Interest, costs and attorney fees; and

    E.    Such other and further relief as is warranted and appropriate.

### TENTH CAUSE OF ACTION

### (Civil Battery)

146.    Mr. Agro hereby incorporates by reference and realleges paragraphs 1 through 145 of this Complaint as if fully restated herein.

147.    The Defendants, through their conduct and omissions, acting by and through their respective agents, servants, and/or employees, inflicted harmful or offensive contact to Mr. Agro by exposing him to radiation fields which they knew could cause biological changes and had the potential to cause permanent and significant health risks and effects.

148.    Based upon their conduct, Defendants intended to and did inflict this specific harm upon Mr. Agro, which gave rise to injuries including his current medical condition and development of the tumor in his brain.

WHEREFORE, Plaintiff, Mr. Agro, respectfully requests that judgment be entered against Defendants, jointly and severally, as follows:

    A.    Compensatory damages in an amount in excess of $25,000,000;

    B.    Consequential damages in an amount in excess of $25,000,000;

C.    Punitive and/or exemplary damages in an amount in excess of $100,000,000;

D.    Interest, costs and attorney fees; and

E.    Such other and further relief as is warranted and appropriate.

## ELEVENTH CAUSE OF ACTION

### (Loss of Consortium)

149.    Plaintiff, Mrs. Agro, hereby incorporates by reference and realleges paragraphs 1 through 148 of this Complaint as if fully restated herein.

150.    Mrs. Agro is the spouse of Mr. Agro, was his spouse at the time he first began exhibiting symptoms and was diagnosed with a brain tumor, and she continues to be his spouse to the present.

151.    By reason of the injuries and medical condition suffered and sustained by Mr. Agro, and as a direct, natural, proximate and foreseeable result thereof, Mrs. Agro has been deprived of her husband's comfort, society and companionship, and such deprivation will continue into the future, to the general damage of Mrs. Agro, and she has suffered sorrow, mental anguish, grief, despair, and emotional and psychological stress, which will continue in the future as well. Defendants are therefore jointly and severally liable to Mrs. Agro for general damages in an amount to be assessed.

152.    By virtue of the intentional, malicious and bad faith conduct of Defendants, Mrs. Agro is entitled to recover punitive and/or exemplary damages.

153.    As a direct, natural, proximate and foreseeable consequence of the foregoing, Mrs. Agro has suffered damages which she is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, punitive and/or exemplary damages, interest, costs and attorney fees.

WHEREFORE, Plaintiff, Mrs. Agro, respectfully requests that judgment be entered against

Defendants, jointly and severally, as follows:

A.    Compensatory damages in an amount in excess of $25,000,000;

B.    Consequential damages in an amount in excess of $25,000,000;

C.    Punitive and/or exemplary damages in an amount in excess of $100,000,000;

D.    Interest, costs and attorney fees; and

E.    Such other and further relief as is warranted and appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Respectfully submitted

MORGANROTH & MORGANROTH

By: _Jeffrey B. Morganroth_____
JEFFREY B. MORGANROTH (D.C. Bar #421684)
3000 Town Center, Suite 1500
Southfield, Michigan 48075
(248) 355-3084
Lead Counsel for Plaintiffs

MAYER MORGANROTH
MORGANROTH & MORGANROTH
3000 Town Center, Suite 1500
Southfield, Michigan 48075
(248) 355-3084
Co-Counsel for Plaintiffs in the event that application
for pro hac vice admission to be filed is granted)

[con't on next page]

SHELDON L. MILLER
LOPATIN, MILLER, FRIEDMAN, BLUESTONE
& HERSKOVIC
3000 Town Center, Suite 1700
Southfield, Michigan  48075
(248) 213-3800
Co-Counsel for Plaintiffs in the event that application
for pro hac vice admission to be filed is granted)

JOANNE L. SUDER (D.C. Bar # 313619)
THE SUDER LAW FIRM, P.A.
210 E. Lexington Street, Suite 100
Baltimore, MA  21202
(410) 727-8177
Co-Counsel for Plaintiffs

Dated: February 22, 2002